**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| EDWARD SWEAT, and MARIE GARZA-SWEAT individually and on behalf of a class of similarly situated individuals, <br><br> *Plaintiffs*, <br><br> v. <br><br> HOUSTON METHODIST HOSPITAL, <br><br> *Defendant.* | **No. 4:24-cv-00775** <br><br> **Assigned to Hon. David Hittner** <br><br> **(JURY DEMANDED)** |

## <u>FIRST AMENDED CLASS ACTION COMPLAINT</u>

Plaintiffs Edward Sweat and Marie Garza-Sweat (collectively "Plaintiffs") bring this First Amended Class Action Complaint against Defendant Houston Methodist Hospital ("Houston Methodist" or "Defendant") to stop Defendant's unlawful disclosure of its patients' confidential personally identifiable information and protected health information and to seek redress for all those who have been harmed by Defendant's misconduct. Plaintiffs allege as follows based on personal knowledge as to themselves and their own acts and experiences and as to all other matters, on information and belief, including an investigation by their attorneys.

## <u>THE PARTIES</u>

1. Plaintiff Edward Sweat is a natural person, resident, and a citizen of Texas.

2. Plaintiff Marie Garza-Sweat is a natural person, resident, and citizen of Texas.

3. Defendant Houston Methodist Hospital is a Texas Nonprofit corporation with its principal office in Houston, Harris County Texas.

1

## JURISDICTION AND VENUE

4. Jurisdiction in this Court is proper pursuant to 28 U.S.C § 1331, Federal Question jurisdiction as Plaintiffs' First Amended Class Action Complaint alleges violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et. seq.*

5. Venue is proper in in this Court under 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## INTRODUCTION

6. Plaintiffs bring this action to address Defendant's transmission and disclosure of Plaintiffs' and Class Members' confidential personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information" or "PII and PHI") to Meta Platforms, Inc. d/b/a Meta ("Facebook") and/or Google LLC d/b/a Google ("Google") via tracking pixels ("Tracking Pixels" or "Pixel") installed on Defendant's Website.

7. Houston Methodist is a healthcare provider in Houston, Texas. Providing assistance to more than 2.23 million patients and generating over $12 billion in patient revenue, Houston Methodist is one of the largest medical systems in Texas.[12] Despite its position as a massive and trusted healthcare provider, Houston Methodist knowingly configured and implemented a software device known as a tracking pixel to collect and transmit information from www.houstonmethodist.org/ (the "Website") to third parties, including confidential patient searches through the "Find a Doctor" tab and appointment scheduling page on the Website and, upon information and good faith belief, information communicated in the sensitive and presumptively confidential MyChart patient portal.

---

[1] www.houstonmethodist.org/research/about-us/facts-stats/
[2] www.ahd.com/free_profile/450358/Houston_Methodist_Hospital/Houston/Texas/

8. Plaintiffs and Class Members are individuals who have looked for or obtained medical services and/or treatment from Defendant. Defendant advertises its online services on its Website to assist patients with their medical care, and Defendant encouraged its patients to use its Website for booking medical appointments and procedures; locating treatment facilities; searching for physicians and information about specific medical conditions, treatment options, and services; communicating medical symptoms; signing up for events and classes; and more.

9. Plaintiffs and other Class Members who used Defendant's Website thought they were communicating only with their trusted healthcare provider. Unbeknownst to Plaintiffs and Class Members, however, Defendant has embedded the Facebook Tracking Pixel (the "Tracking Pixel" or "Pixel"), on its Website, forcing Plaintiffs and Class Members to transmit to Facebook and other third parties every click, keystroke, and intimate detail about their medical treatment without their knowledge and consent. Operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiffs and Class Members submit to Defendant to be unlawfully disclosed to Facebook and other third parties alongside the individual's IP address and unique Facebook ID ("FID").

10. A pixel is a piece of code that "tracks the people and [the] type of actions they take" as they interact with a website, including how long a person spends on a particular web page, which buttons the person clicks, which pages they view, and the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box), among other things.

11. The user's web browser executes the Pixel via instructions within the webpage to communicate certain information based on criteria selected by the website's owner. The Tracking Pixel is thus customizable and programmable, meaning that the website owner controls which of

its pages contain the Pixel and which events are tracked and transmitted to Facebook and other third-party tracking technology vendors.

12. In addition to the Tracking Pixel, Defendant also likely installed and implemented Facebook's Conversions Application Programming Interface ("CAPI") on its Website.

13. Unlike the Tracking Pixel, which uses a website visitor's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers. Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[3]

14. Because CAPI is located on the website owner's servers and is not based on the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other tools the website user may use that would otherwise prevent the Pixel from sending website visitors' Private Information to Facebook directly.

15. Defendant utilized the Tracking Pixel and CAPI data for marketing purposes in an effort to bolster its profits. The Tracking Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiffs' and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

---

[3] www.facebook.com/business/help/2041148702652965?id=818859032317965

16. The information that Defendant's Tracking Pixel and CAPI sent to Facebook and other third parties included the Private Information that Plaintiffs and Class Members submitted to Defendant's Website, including for example, the type of medical treatment sought, the individual's particular health condition, and the fact that the individual attempted to or did book a medical appointment.

17. Such information allows a third-party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers who geotarget Plaintiffs' and Class Members' Facebook pages based on communications obtained via the Tracking Pixel and CAPI. Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

18. Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to an unknown third party, let alone Facebook, without the patient's consent. Neither Plaintiffs nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook.

19. Despite intentionally incorporating the Tracking Pixel and CAPI into its Website and related servers, Defendant has never disclosed to Plaintiffs or Class Members that it shared their sensitive and confidential communications and Private Information with Facebook and likely other third parties. Plaintiffs and Class Members were unaware that their Private Information was being surreptitiously transmitted to unauthorized third parties as they communicated with their

healthcare provider via the Website, or stored on Defendant's servers to be later transmitted to Facebook so it could be used for targeted advertising and marketing purposes.[4]

20.     Defendant further made express and implied promises to protect Plaintiffs' and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

21.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiffs' and Class Members' communications and medical information safe, secure, and confidential.

22.     The disclosure of Plaintiffs' and Class Members' Private Information via the Pixel contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). As part of HIPAA, the United States Department of Health and Human Services ("HHS") established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.

23.     In short, pursuant to HIPAA, covered entities such as Defendant are ***not*** permitted to use tracking technology tools (like pixels) in a way that exposes patients' Private Information to any third-party without express and informed consent from each patient.

24.     Furthermore, the Office for Civil Rights (OCR) at HHS has also made clear, in a recent bulletin entitled *Use of Online Tracking Technologies by HIPAA Covered Entities and*

---

[4] In contrast to Defendant, in recent months several medical providers which have installed the Facebook Pixel on their web properties have provided their patients with notices of data breaches caused by the Pixel transmitting PHI to third parties. *See*, *e.g.*, https://cerebral.com/static/hippa_privacy_breach-   4000c6eb21449c2ecd8bd13706750cc2.pdf; www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixelsprotected-health-information-3;   www.hipaajournal.com/novant-health-notifies-patients-about- unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal

*Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[5]

25. Upon information and good faith belief, Defendant utilized the Pixel data to improve and to save costs on its marketing campaigns, improve its data analytics, and attract new patients.

26. Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

27. However, as set forth more fully below, Defendant failed in its obligations and promises by using Tracking Pixels while knowing that doing so would result in the transmission and disclosure of Plaintiffs' and Class Members' Private Information to unauthorized third parties with a history of privacy violations and misconduct, including Facebook.

28. Plaintiffs' and Class Members' Private Information can—and likely will—be further exploited and disseminated for retargeting, marketing, or insurance companies utilizing the information to set insurance rates.

29. Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*: (i) failing to adequately review its Websites to ensure that they were safe and secure; (ii) failing to remove or disengage technology that was known and designed to

---

[5] www.hhs.gov/hipaa/for- professionals/privacy/guidance/hipaa-online-tracking/index.html

share web-users' information; (iii) aiding, agreeing, and working with third-parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook, Google, or others; (v) failing to take steps to block the transmission of Plaintiffs' and Class Members' Private Information through Tracking Pixels; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

30. Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) invasion of privacy, (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Tracking Pixel, (iii) loss of benefit of the bargain, (iv) diminution or deprivation of value of the Private Information, (v) statutory damages, and (vi) the continued and ongoing risk of exposure of their Private Information.

31. Plaintiffs seek to remedy these harms and bringing causes of action for Negligence, Negligence Per Se, Invasion of Privacy, Breach of Implied Duty of Confidentiality, Breach of Fiduciary Duty, Unjust Enrichment and Violation of the Electronic Communications Privacy Act.

**COMMON FACTUAL ALLEGATIONS**

**A. Facebook's Tracking Tools**

32. Facebook operates the world's largest social media company and in conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

33. Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits

of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

34. The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, the webpage's URL, as well as metadata, button clicks, and other information. Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[6]

35. One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[7] When a user accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook, traveling from the user's browser to Facebook's server.

36. Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as Defendant's "Find a Doctor" page[8]).

37. The Meta Pixel's primary purpose is for marketing and ad targeting and sales generation.[9]

38. Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[10]

---

[6] www.facebook.com/business/help/964258670337005
[7] www.facebook.com/business/goals/retargeting
[8] www.houstonmethodist.org/find-a-doctor/
[9] https://developers.facebook.com/docs/meta-pixel/
[10] www.facebook.com/business/help/742478679120153

39. According to Facebook, the Meta Pixel can collect and transmit the following data:

**Http Headers** - Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and *person using the website.*

**Pixel-specific Data** – Includes Pixel ID and Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** - Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** - Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[11]

40. Facebook further advertises to prospective users that the Meta Pixel can be used to:

1) Make sure ads are shown to the right people – Find new customers, or people who have visited a specific page or taken a desired action on your website.

2) Drive more sales – Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

3) Measure the results of ads – Better understand the impact of your ads by measuring what happens when people see them.

41. Facebook likewise benefits from the data received from the Meta Pixel and uses the

---

[11] https://developers.facebook.com/docs/meta-pixel/

data to serve targeted ads and identify users to be included in such targeted ads.

42. Accordingly, during the aforementioned transmissions received from the Meta Pixel, Defendant's Website routinely provide Facebook with Defendant's patients' Facebook IDs, IP addresses, and/or device IDs and the other information they input into Defendant's Website, including not only their medical searches, treatment requests, and the webpages they view, but also their home address, zip code, or phone number. This is precisely the type of identifying information that HIPAA requires healthcare providers to de-anonymize to protect the privacy of patients.[12] Plaintiffs' and Class Members identities can be easily determined based on the Facebook ID, IP address and/or reverse lookup from the collection of other identifying information that was improperly disclosed.

43. After intercepting and collecting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences. If the website visitor is also a Facebook user, the information collected via the Tracking Pixel is associated with the user's Facebook ID that identifies their name and Facebook profile, i.e., their real-world identity.

44. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

45. Notably, this transmission only occurs on webpages that contain a Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate privacy

---

[12] www.hhs.gov/hipaa/for- professionals/privacy/special-topics/de-identification/index.html

and disable it on pages that do implicate patient privacy.

46. Separate from the Meta Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet-whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website.

47. With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from the entity's server to Facebook's server.

48. Conversions API "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[13] Thus, the entity receives and stores its communications with patients on its server before Conversions API collects and sends those communications-and the Private Information contained therein-to Facebook.

49. Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

50. While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website events [with

---

[13] www.facebook.com/business/help/2041148702652965

Facebook] that the pixel may lose."[14] Thus, if an entity implemented the Meta Pixel in accordance with Facebook's documentation, it is also reasonable to infer that it implemented the Conversions API tool on its Website.

51. The third parties to whom a website transmits data through pixels and other tracking technology do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (i.e., to bolster profits).

52. Accordingly, without any knowledge, authorization, or action by a user, an operator of websites like Defendant can use its websites to essentially commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

**B.      Defendant is found to have used Facebook's Tracking Pixel**

53. In or around June 2022, The Markup, a nonprofit reporting agency and website focusing on technology and its effects on society, conducted an investigation of the use of tracking tools, such as the Tracking Pixel, on the online platforms of Newsweek's top 100 hospitals in America.[15]

54. The Markup discovered the Tracking Pixel was operating on 33 of the 100 hospitals investigated.[16] Defendant was one of the hospitals found operating the Pixel on its Website— including specifically the webpage that allows patients to book appointments with healthcare

---

[14] *See* www.facebook.com/business/help/308855623839366

[15] https://themarkup.org/pixel-hunt/2022/06/16/facebook- is-receiving-sensitive-medical-information-from-hospital-websites

[16] *Id.*

providers.[17]

55.     As the Markup found, a user that visits Defendant's Website and clicks on the "Find a Doctor" tab, the individual's browser sends a request to Defendant's server requesting that it load the webpage. Because Defendant's Website utilizes the Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, causing the browser to secretly duplicate the communication with Defendant and transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

56.     For example, if the user clicks "Find a Doctor" and enters their Zip Code and the doctor's specialty, like "Addiction Psychiatry," or uses another search term to find a doctor, such as "heart disease," this information is shared with Facebook, Google, or others that Defendant has configured its Pixels to interact with.

57.     After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

58.     Furthermore, every time Defendant sends a patient's website activity data to Facebook, that patient's PII is also disclosed, including their Facebook ID. Critically, while Facebook can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of an FID.

59.     Google and other companies likewise process this data in a similar manner and use it to connect the information to particular individuals to build marketing and other data profiles.

60.     Defendant could have configured its tracking software to limit the information that it communicated to third parties, but it did not and instead intentionally selected the features and

---

[17] *Id.*

functionality of the Pixel that resulted in disclosure of its patients' Private Information.

61. As such, Defendant intercepted and disclosed to Facebook and other third-parties Plaintiffs' and Class Members' Private Information including their: (1) status as medical patients; (2) health conditions; (3) treatment and therapies; (4) communications with Defendant through its Website; (5) information about their medical appointments, location of treatments, specific medical providers, specific medical conditions and treatments, and related information; (6) webpages that were viewed; and (7) phrases entered and search queries conducted via the general search bar, such as to obtain specific information about a symptom they are experiencing.

62. Plaintiffs and Class Members did not intend or have any reason to suspect the Private Information would be shared with Facebook, Google, or other third parties, or that Defendant was tracking their every communication and disclosing the same to third parties when they entered highly sensitive information on Defendant's Website. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information.

**C. Defendant's Use of Tracking Pixels Violated its Own Privacy Policies**

63. Defendant's Privacy Policy provides that Defendant is "required, by law, to keep [patients'] identifiable health information private[.]"[18]

64. Defendant's Privacy Policy further enumerates specific instances when it is permitted to use and release the health information of its patients including: treatment purposes, payment purposes, healthcare operations, and when it is required by law.[19]

65. None of the permissible purposes for disclosure of Private Information/PHI without

---

[18] www.houstonmethodist.org/privacy-notice/

15

authorization stated in Defendant's Notice of Privacy Practices include the Disclosure of Plaintiffs' and the Class Members' Private Information to Facebook as alleged in this case.

66.     Further, Defendant's policy states that it will "obtain your written authorization prior to electronically disclosing [patients'] protected health information for any reason other than treatment, payment health case operations or as otherwise authorized or required by law."[20]

67.     Defendant violated its own Privacy Policy by unlawfully disclosing Plaintiffs' and Class Members' Private Information to Facebook, Google, and likely other third parties, and failing to obtaining Plaintiffs' and Class Members' consent prior to disclosure.

68.     Further, the Privacy Policy states that its patients have the right to be notified following a breach of its patients' unsecured health information[21] which Defendant has also failed to do.

69.     Thus, Defendant violated its own Website Terms and Online Privacy Policy by unlawfully disclosing Plaintiffs' and Class Members' Private Information to Meta (Facebook), Google, and likely other third parties. Defendant further misrepresented that it would preserve the confidentiality of their Private Information and the anonymity of their identities.

**D.     Defendant's Use of Tracking Pixels Violates HIPAA Standards**

70.     Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patient's express written authorization.[22]

71.     Guidance from the United States Department of Health and Human Services ("HHS") instructs healthcare providers that patient status alone is protected by HIPAA.

---

[21] *Id.*
[22] 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

72. The Privacy Rule broadly defines "protected health information" ("PHI") as individually identifiable health information ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."[23]

73. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual."[24]

74. The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization.[25]

75. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it knowingly discloses individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

76. HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule and specifically prohibits unauthorized disclosure of protected health information in connection with marketing:

    a.  "The sale of patient list to a marketing firm" is not permitted

---

[23] 45 C.F.R. § 160.103
[24] *Id.*
[25] 45 C.F.R. §§ 160.103, 164.502

under HIPAA.[26]

b. "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list.[27]

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers."[28]

77. In addition, the Office for Civil Rights (OCR) at HHS has issued a Bulletin (the "HHS Bulletin") to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies.

78. The HHS Bulletin expressly provides:

Tracking technologies are used to collect and analyze information about how users interact with regulated entities' websites or mobile applications ("apps"). For example, a regulated entity may engage a technology vendor to perform such analysis as part of the regulated entity's health care operations. The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures[29] of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant**

_____

[26] 65 Fed. Reg. 82717 (Dec. 28, 2000)

[27] 67 Fed. Reg. 53186 (Aug. 14, 2002).

[28] 78 Fed. Reg. 5642 (Jan. 25, 2013).

[29] *See id.* at n.8 ("Regulated entities can use or disclose PHI, without an individual's written authorization, only as expressly permitted or required by the HIPAA Privacy Rule. *See* 45 CFR 164.502(a).").

**authorizations, would constitute impermissible disclosures.[30]**

79. Tracking technology vendors like Facebook and Google are considered business associates under HIPAA where, as here, they provide services to Defendant and receive and maintain PHI.

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[31]

80. The HHS Bulletin explained that, through tracking technologies such as the Tracking Pixel, covered entities disclose individual's information, including PHI, provided when individuals use the entity's website or mobile applications, such as medical records numbers, addresses, appointment dates, person's IP addresses or location, medical device IDs or unique identifying codes.[32]

81. The Bulletin further explained that "[a]ll such IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing

---

[30] 45 C.F.R. § 164.508(a)(3); 45 C.F.R. §164.501 (defining "Marketing")
[31] 45 C.F.R. § 164.508(a)(3); 45 C.F.R. §164.501 (defining "Marketing")
[32] *Id.*

information like dates and types of health care services."[33] This is because that information "connects the individual to the regulated entity . . . and thus relates to the individual's past, present, or future health or health care or payment for care."[34]

82.     As such, HIPAA applies to Defendant's Website with tracking technologies even outside the patient portal:

Tracking on unauthenticated webpages

[T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal **… [and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances**. For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider. In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.[35]

83.     Ultimately, in the Bulletin, HHS made clear that covered entities, such as Defendant, must comply with HIPAA rules in connection with tracking technologies such as the Tracking Pixel, including but not limited to:

1)      Ensuring that all disclosures of PHI to tracking technology vendors are specifically permitted by the Privacy Rule and that, unless an exception applies, only the minimum necessary PHI to achieve the intended purpose is disclosed.

2)      Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does **not** permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice,

---

[33] *Id.*
[34] *Id.*
[35] *Id.*

or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.

3) If there is not an applicable Privacy Rule permission or if the vendor is not a business associated of the regulated entity, then the individuals' HIPAA- compliant authorizations are required **before** the PHI is disclosed to the vendor. Website banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do **not** constitute a valid HIPAA authorization.

Further, it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place **and** requires that there is an applicable Privacy Rule permission for disclosure.[36]

84. The HHS Bulletin further noted that the impermissible disclosure of PHI can cause myriad harm to individuals, including "identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI" and discloses highly sensitive information regarding patients' diagnoses, and the nature, frequency and location of treatment.[37]

85. The Bulletin is not a pronouncement of new law, but instead reminded covered entities and business associates of their longstanding obligations under existing guidance. The HHS Bulletin cautioned that, "[w]hile it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule."[38]

---

[36] *Id.*
[37] *Id.*
[38] *Id.*

86.     In other words, under the HHS' analysis and guidance regarding HIPAA's privacy rules, Defendant has violated HIPAA rules by implementing the Tracking Pixel without obtaining proper authorization to do so.

**E.      Defendant's Use of Tracking Pixels Violated FTC Standards**

87.     The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[39]

88.     On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[40]

89.     Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[41] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[42]

90.     Entities that are not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule 16 C.F.R. Section 318. This Rule requires that companies dealing with health records notify the FTC and

---

[39] www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf.
[40] www.ftc.gov/news- events/news/press-releases/2023/07/ftc-hhs-wam-hospital-systems-telehealth-providers-about-privacy- security-risks-online-tracking?utm_source=govdelivery
[41] *Id.*
[42] *Id.*

consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization,* triggers notification obligations under the Rule."[43]

91. Additionally, according to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[44]

92. As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

**F.      Defendant's Use of Tracking Pixels Violated Industry Standards**

93. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

94. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

95. AMA Code of Medical Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care. . . . Patient privacy encompasses a number of aspects, including, . . . personal data (informational privacy).[45]

96. AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services.

[43]www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_comm ission_o n_breaches_by_health_apps_and_other_connected_devices.pdf.
[44] www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; www.ftc.gov/legal- library/browse/cases-proceedings/2023169-betterhelp-inc-matter; www.ftc.gov/legal-library/browse/cases-proceedings/2023090- goodrx-holdings-inc; www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.
[45] https://code-medical- ethics.ama-assn.org/ethics-opinions/privacy-health-care

Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified [, and] (b) [f]ully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity) about the purpose(s) for which access would be granted.[46]

97.     AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must: . . . (c) release patient information only in keeping ethics guidelines for confidentiality.[47]

**G.     Defendant Financially Benefitted From Its Use of the Pixel and the Unauthorized Disclosures at Issue.**

98.     The purpose and end-outcome of Defendant's use of the Facebook Pixel and other tracking technology was marketing and profits.

99.     In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook, Google, and likely others in the form of enhanced advertising services and more cost-efficient marketing on their platforms.

100.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

101.    By utilizing the Facebook Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**H.     Defendant's Use of Tracking Pixels violated Plaintiffs' and Class Members' Expectation of Privacy**

---

[46] https://code-medical-ethics.ama-assn.org/ethics-opinions/access-medical-records-data-collection-companies
[47] https://code-medical-ethics.ama-assn.org/ethics-opinions/confidentiality-electronic-medical-records

102. Plaintiffs and the other Class Members received healthcare services from one of the hospitals in Defendant's network and relied on Defendant's Website to communicate confidential Private Information.

103. Plaintiffs and the other Class Members reasonably expected that their online communications with Defendant were confidential, solely between themselves and Defendant, and that such communications would not be transmitted to or intercepted by third parties.

104. Plaintiffs, like the other members of the Class, are also Facebook users and visited Defendant's Website while logged into Facebook.

105. Plaintiffs used Defendant's Website and MyChart portal to schedule appointments for medical care, review their personal health information, look for medical information regarding their symptoms, find doctors, and communicate their Private Information to Defendant. Plaintiffs also used Defendant's Website to request doctor referrals, renew prescriptions, and obtain a history of lab results. Plaintiffs trusted that their Private Information would be safeguarded according to Defendant's privacy policies and state and federal law.

106. As described herein, Defendant sent Plaintiffs' Private Information to Facebook, Google, and others when they used Defendant's Website in the course of obtaining medical care.

107. Pursuant to the processes described herein, Defendant assisted Facebook, Google, and others with intercepting Plaintiffs' communications, including those that contained personally identifiable information, protected health information, and related confidential information. Defendant facilitated these interceptions without Plaintiffs' knowledge, consent, or express written authorization.

108. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiffs' personally identifiable information and protected health

25

information.

109.     At all times when Plaintiffs and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

110.     Furthermore, the data concerning Plaintiffs and Class Members, collected and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements.[48] [49] [50] These advertisements are the main source of Facebook's revenue. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than *98%* of its total revenue for that year.[51]

111.     Indeed, consumer data is so valuable that conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling their online data—with the figure not being limited to such valuable and specific data as the Private Information that Defendant obtained through its Website. Indeed, the health data market is a lucrative source of profit and poses significant risks to patients' privacy rights.[52] [53]

### I.     Facts Specific to Plaintiff

---

[48] www.facebook.com/business/ads/ad-targeting
[49] *Id.*
[50] www.facebook.com/business/help/465262276878947
[51] www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html
[52] https://time.com/4588104/medical-data-industry/
[53] www.cnbc.com/2019/12/l 8/hospital-execs-say-theyre- flooded-with-requests-for-your-health-data.html (""[d]e- identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers")

26

112. Plaintiffs are currently and have been patients at Defendant's hospitals in Defendant's network since 2017 and have used Defendant's Website consistently since becoming patients.

113. Plaintiffs have used Defendant's Website to communicate Private Information to it on numerous occasions.

114. Plaintiffs have been using Defendant's Website, including the MyChart Portal, since approximately 2017 to the present. Plaintiffs access Defendant's Website to receive healthcare services from Defendant.

115. Specifically, Plaintiffs use Defendant's Website to: communicate Private Information with their healthcare provider, search for physicians, schedule appointments and procedures, receive and discuss medical diagnoses and treatment from their healthcare providers, search for symptoms, receive and view lab results, receive and view medical records, receive and view medication changes, and view their appointment history.

116. Based on the presence of the Pixels on its Website during the times that Plaintiffs submitted the aforementioned Private Information to Defendant, Defendant unlawfully tracked and unlawfully transmitted their Private Information, including the specific contents and communications contained in ¶ 117, to Facebook and other third-parties.

117. Importantly, the Private Information Defendant's Pixel sent to Facebook specifically was sent alongside the Plaintiffs' Facebook IDs, thereby allowing their confidential communications with Defendant and the Private Information contained in those communications, to be linked to their unique Facebook accounts.

118. As Defendant's patient, Plaintiffs reasonably expected that their online communications with Defendant were solely between themselves and Defendant such that the

27

communications would not be transmitted or intercepted by a third-party.

119. Despite their status as Defendant's patients, Defendant's Website also provided Facebook and other third-parties with Plaintiffs' FIDs, IP addresses, and/or device IDs each time Plaintiffs communicated Private Information as described above.

120. In sum, Defendant's Pixel transmitted Plaintiffs' highly sensitive communications and Private Information to Facebook, including communications that contained Private Information, alongside identifying information, without Plaintiffs' knowledge, consent, or express authorization.

## TOLLING, CONCEALMENT, AND ESTOPPEL

121. The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein given the affirmative representations and assurances of confidentiality featured in its Privacy Policy.

122. Defendant incorporated a Meta Pixel and other trackers into its Website while providing users with no indication that their Website usage was being tracked and transmitted to third parties. Defendant knew that its Website incorporated a Facebook Pixel and other trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties.

123. Plaintiffs and Class Members could not with due diligence have discovered the full scope of Defendant's conduct, because there were no disclosures or other indication that they were interacting with a website employing Facebook's Pixel or any other tracking technology that would disclose their Private Information.

124. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Defendant's illegal interception and disclosure

28

of Plaintiffs' and the Class Members' Private Information has continued unabated through the present. What is more, Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

125. Plaintiffs bring this statewide class action on behalf of themselves and on behalf of other similarly situated persons.

126. The statewide Class that Plaintiffs seek to represent is defined as follows:

**All individuals located within the state of Texas whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and other related technology without their authorization.**

127. Excluded from the Class are: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

128. The number of Class Member is so numerous that joinder of all members is impracticable. Upon information and belief, there are thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant.

129. Class Members are readily identifiable from information in Defendant's possession, custody, and control, including records of their interactions with Defendant's Website.

130. There are questions of law and fact common to the Class that predominate over any questions affecting individual Class Members including:

29

a. Whether Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

b. Whether Defendant had a duty not to disclose the Plaintiffs' and Class Members' Private Information to unauthorized third parties;

c. Whether Defendant had a duty not to use Plaintiffs' and Class Members' Private Information for non-healthcare purposes;

d. Whether Defendant had a duty not to use Plaintiffs' and Class Members' Private Information for unauthorized purposes;

e. Whether Defendant disclosed Plaintiffs' and Class Members' Private Information without their authorization through its use of a tracking Pixel on its Website;

f. Whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' Private Information by implementing a tracking Pixel on its Website;

g. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been disclosed without their authorization through its use of a tracking Pixel on its Website;

h. Whether Defendant failed to properly implement and configure the tracking Pixel on its Website to prevent the disclosure of Private Information;

i. Whether Defendant's conduct constitutes an invasion of privacy;

j. Whether Defendant breached its contract with Plaintiffs and the Class Members; or in the alternate, whether Defendant was unjustly enriched; and,

k. Whether Defendant's conduct was in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*.

131.    Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of a tracking Pixel on its Website.

132.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

133.    Plaintiffs will fairly and adequately represent and protect the interests of the Class Members and Plaintiffs have no conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs' injuries are typical of the other Class Members and Plaintiffs have retained counsel experienced in complex class action litigation and intends to prosecute this action vigorously.

134.    Class treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein given the large number of Class Members and the relatively modest damages suffered by the Class Members who would otherwise not be able to afford to litigate their claims against Defendant.

135.    Defendant's uniform conduct, the common claims shared amongst the Class Members, and the ascertainable identities of Class Members, demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

136.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

137. Defendant has acted or refused to act on grounds generally applicable to the Class as a whole by failing to notify Class Members of the disclosure of their Private Information through its use of a tracking Pixel and to secure such information, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

<u>**COUNT I**</u>
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Class)**

138. Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

139. Plaintiffs and the other Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website.

140. Plaintiffs and Class Members communicated sensitive PHI and PII that they intended only for Defendant to receive and that they understood Defendant would keep private and confidential.

141. Defendant intentionally disclosed the substance and nature of those communications to third parties without the knowledge and consent of Plaintiffs and Class Members through its use of a tracking Pixel on its Website.

142. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

143. Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Facebook, a third-party marketing giant, and other third parties, is highly offensive to a reasonable person.

144. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns,

32

of a kind that would be highly offensive to a reasonable person.

145. Defendant's conduct constitutes an intentional physical or sensory intrusion of Plaintiffs' and Class Members' privacy because Defendant facilitated Facebook's and other third parties' simultaneous collection and exploitation of confidential communications.

146. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Pixels onto its Website because the purpose of the Pixels is to track and disseminate the individual's communications with the Website for the purpose of marketing and advertising.

147. Because Defendant intentionally and willfully incorporated the Pixels into its Website and encouraged patients to use those Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

148. As a result of Defendant's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

149. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

150. Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still in the possession of Facebook and other third parties who can use such information at their disposal without any known limits and since the wrongful disclose of such Private Information cannot be undone.

151. Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as a result of Defendant's intrusions upon Plaintiffs and Class Members'

33

privacy.

152.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the willful and intentional nature of Defendant's actions, directed at injuring Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

153.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**<u>COUNT II</u>**
**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2510 *et seq***
**(On Behalf of Plaintiffs and the Class)**

154.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

155.    The ECPA protects both the sending and receipt of electronic communications.

156.    The ECPA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted. 18 U.S.C. § 2520(a).

157.    A violation of the ECPA occurs where any person/entity "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

158.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

159. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo optical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

160. "Contents" includes "any information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

161. Defendant's Website, including the MyChart portal, are an electronic communication service under the ECPA.

162. Plaintiffs and Class members' interactions with Defendant's Website, including the MyChart patient portal, are electronic communications under the ECPA.

163. Whenever Plaintiffs and Class members interacted with Defendant's Website, Defendant contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiffs' and Class members' electronic communications without authorization or consent through its use of a tracking Pixel.

164. Whenever Plaintiffs and Class members interacted with Defendant's Website, including the MyChart patient portal, Defendant contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Class members' electronic communications to third parties, including Facebook, as well as potentially other entities such as Google, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

165. Whenever Plaintiffs and Class members interacted with Defendant's Website, including the MyChart patient portal, Defendant contemporaneously and intentionally used, and endeavored to use the contents of Plaintiffs' and Class members' electronic communications for

35

purposes other than providing health care services to Plaintiffs and Class members and without authorization or consent.

166. Whenever Plaintiffs and Class members interacted with Defendant's Website, including the MyChart patient portal, Defendant contemporaneously and intentionally redirected the contents of Plaintiffs' and Class members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

167. Whenever Plaintiffs and Class members interacted with Defendant's Website, including the MyChart patient portal, Defendant contemporaneously and intentionally divulged the contents of Plaintiffs' and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Facebook.

168. Defendant intentionally intercepted and used the contents of Plaintiffs' and Class members' electronic communications for the unauthorized purpose of disclosing and, on information and belief, profiting from, Plaintiffs' and Class members' communications by selling the contents to third parties including Facebook.

169. Plaintiffs and Class members did not authorize Defendant to acquire the content of their communications for purposes of sharing and selling the personal information contained therein.

170. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

171. The ECPA provides that a "party to the communication" may be liable where a

36

"communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

172. Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' and Class Members' Private Information does not qualify for the party exemption.

173. Defendant's acquisition of patient communications that were used and disclosed to Facebook and third parties was done for purposes of committing a criminal and tortious acts in violation of the laws of the United States and Texas, including:

    a. Criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

    b. Violation of Tex. Admin. Code § 133.42 (a)(1)(H);

    c. Violation of Texas Health and Safety Code § 181.153; and

    d. Invasion of Privacy.

174. Under 42 U.S.C. § 1320d-6, it is a criminal violation for a person to "use[] or cause[] to be used a unique health identifier" or to "disclose[] individually identifiable health information to another person . . . without authorization" from the patient.

175. The penalty for violation is enhanced where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

176. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

    a. Used and caused to be used cookie identifiers associated with specific patients without patient authorization; and

    b. Disclosed individually identifiable health information to Facebook and

other third-parties without patient authorization.

177. Defendant's conduct would be subject to enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Facebook's and third-party Pixels was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

178. The Texas Administrative Code § 133.42 states that "[a] hospital shall adopt, implement, and enforce a policy to ensure patients' rights."

179. § 133.42 (a)(1)(H) creates the "right of the patient, within the limits of law, to personal privacy and confidentiality of information."

180. Defendant's conduct violated Tex Admin. Code § 133.42 (a)(1)(H) where it disclosed its patients' Private Information to Facebook and other third-parties without their express authorization or consent.

181. The Texas Health and Safety Code § 181.153 prohibits a "covered entity" from disclosing "an individuals protected health information to any other person in exchange for direct or indirect remuneration. . ."

182. Defendant is a "covered entity" under The Texas Health and Safety Code § 181.001(b)(2).

183. Defendant's conduct violates Texas Health and Safety Code § 181.153 because Defendant's use of Facebook's and third-party Pixels to disclose its patients' protected health information is for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

184. Defendant obtained the information and the marketing services that it did only because of its violations of law described above.

185. As such, Defendant cannot viably claim any exception to ECPA liability.

186. As a direct and proximate result of Defendant's violation of the ECPA, Plaintiffs and Class members were damaged by Defendant's conduct in that:

    a.    Defendant harmed Plaintiffs' and Class members' interest in privacy;

    b.    Sensitive and confidential information that Plaintiffs and Class members intended to remain private has now been disclosed and is no longer private and confidential;

    c.    Defendant took something of value from Plaintiffs and Patient Class members and derived benefit therefrom without Plaintiffs' and Class members' authorization, informed consent, or knowledge, and without sharing the benefit of such value;

    d.    Plaintiffs and Class members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

    e.    Defendant's actions diminished the value of Plaintiffs' and Class members' personal information.

187. As a result of Defendant's violation of the ECPA, Plaintiffs are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

### COUNT III
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

188. Plaintiffs re-allege and incorporates the above allegations as if fully set forth herein.

189. This claim is pleaded solely in the alternative to Plaintiffs' breach of implied

contract claim.

190. Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain through its use of a tracking Pixel, including for advertisement purposes, sale, or trade for valuable services from third parties, including but not limited to Facebook.

191. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

192. Plaintiffs and Class Members suffered actual damages in an amount equal to the value of the data that Defendant disclosed to third parties, including Facebook, through its use of a tracking Pixel.

193. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Petition.

194. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the unauthorized disclosures alleged herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, EDWARD SWEAT and MARIE GARZA-SWEAT, Individually, and on behalf of all others similarly situated, pray for judgment as follows:

A. for an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B. for an award of actual damages, compensatory damages, statutory damages and statutory penalties, in an amount to be determined, as allowable by law;

C. for an award of punitive damages, as allowable by law;

D. for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E. for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

F. for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

G. an order Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

H. for an award of attorneys' fees under the common fund doctrine, and any other applicable law;

I.   costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

J.   pre- and post-judgment interest on any amounts awarded; and

such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiffs, on behalf of themselves, and all others similarly situated, hereby demand a trial by jury on all issues so triable.

Respectfully submitted,

By:   */s/ Paul O. Wickes*

Eugene Y. Turin (*pro hac vice* to be filed)
Illinois Bar No. 6317282
Jordan R. Frysinger (*pro hac vice* to be filed)
Illinois Bar No. 6335897
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
eturin@mcgpc.com
jfrysinger@mcgpc.com

Paul O. Wickes
State Bar No. 00788663
**WICKES LAW, PLLC**
5600 Tennyson Parkway, Ste. 205
Plano, Texas 75024
(972) 473-6900
(972) 767-3225 FAX


ATTORNEYS FOR PLAINTIFFS
EDWARD SWEAT and MARIE GARZA-SWEAT,
individually and on behalf of similarly situated
individuals (the Putative Class)

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via the court's electronic filing and service system on March 29, 2024.

<u>  /s/ Paul O. Wickes  </u>