IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EDWARD SWEAT, et al., individually and on behalf of a class of similarly situated individuals, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Civil Action No. 24-CV-775 |
| | § | |
| HOUSTON METHODIST HOSPITAL, | § | |
| | § | |
| Defendant. | § | Assigned to Hon. Lee H. Rosenthal |
| | § | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Tracy N. LeRoy
State Bar No. 24062847
tleroy@yettercoleman.com
Mary E. Bracewell
State Bar No. 24139388
mbracewell@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR DEFENDANT
THE METHODIST HOSPITAL

# TABLE OF CONTENTS


I. Nature and Stage of Proceeding ..... 1

II. Statement of Issues and Standard of Review ..... 2

III. Summary of the Argument ..... 4

IV. Factual Background ..... 5

A. The Pixel is a tool for tracking website usage. ..... 5

B. Houston Methodist used the Pixel to gather aggregated ad campaign data. ..... 5

C. Advertising agencies recommended that the hospital use the Pixel. ..... 6

D. Houston Methodist publicly disclosed its use of website tracking technology. ..... 8

E. Houston Methodist also fixed data leakages through vendor tools. ..... 9

F. Houston Methodist also audited all of the remaining tracking tools. ..... 11

V. Argument and Authorities ..... 12

A. With No Criminal Intent, Houston Methodist Cannot Be Civilly Liable. ..... 12

1. Houston Methodist Believed the Pixel Transmitted No Individually Identifying Data. ..... 13

2. Houston Methodist's Statements and Actions Confirm Its Good Faith. ..... 14

B. Houston Methodist's Purely Commercial Purpose for Tracking Is Permissible. ..... 17

1. Houston Methodist Had No Independent Criminal/Tortious Purpose. ..... 18

2. Houston Methodist Had No Criminal or Tortious Purpose. ..... 20

C. Plaintiffs' Unjust Enrichment Claim Fails as Well. ..... 23

VI. Conclusion ..... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acara v. Banks*,
470 F.3d 569 (5th Cir. 2006) .......... 22

*Am. Hosp. Ass'n v. Becerra*,
738 F. Supp. 3d 780 (N.D. Tex. 2024) .......... 15, 18, 23, 25

*Araya v. McLelland*,
525 F.2d 1194 (5th Cir. 1976) .......... 22

*Boudreaux v. Swift Transp. Co.*,
402 F.3d 536 (5th Cir. 2005) .......... 7

*Brown v. De La Cruz*,
156 S.W.3d 560 (Tex. 2004) .......... 16

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010) .......... 21, 23

*Carpenter v. Arredondo*,
714 F. App'x 416 (5th Cir. 2018) .......... 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 6, 7

*Clingman & Hanger Mgmt. Assocs. LLC v. Rieck*,
701 F. Supp. 3d 565 (S.D. Tex. 2023) .......... 26

*Duffie v. United States*,
600 F.3d 362 (5th Cir. 2010) .......... 7

*Glazner v. Glazner*,
347 F.3d 1212 (11th Cir. 2003) .......... 25

*Harris Cnty. Texas v. MERSCORP Inc.*,
791 F.3d 545 (5th Cir. 2015) .......... 26

*Heldenfels Bros., Inc. v. City of Corpus Christi*,
832 S.W.2d 39 (Tex. 1992) .......... 27

*Hunter-Reed v. City of Houston*,
244 F. Supp. 2d 733 (S.D. Tex. 2003) .......... 12

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
806 F.3d 125 (3d Cir. 2015) ........ 21
*In re Pharmatrak, Inc. Priv. Litig.*,
292 F. Supp. 2d 263 (D. Mass. 2003) ........ 19
*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) ........ 23, 25
*Martin v. United States*,
889 F.3d 827 (6th Cir. 2018) ........ 20
*Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*,
999 F.3d 970 (5th Cir. 2021) ........ 26
*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) ........ 21
*Roberts v. Charlotte Mecklenburg Hosp. Auth.*,
2025 WL 880538,n.1 (W.D.N.C. Mar. 20, 2025) ........ 21
*Simpson v. Simpson*,
490 F.2d 803 (5th Cir. 1974) ........ 25
*Sullivan v. Leor Energy LLC*,
600 F.3d 542 (5th Cir. 2010) ........ 26
*Sussman v. Am. Broad. Cos.*,
186 F.3d 1200 (9th Cir. 1999) ........ 21
*United States v. Coles*,
2023 WL 1865349 (S.D.N.Y. Feb. 9, 2023) ........ 20
*United States v. Corbett*,
921 F.3d 1032 (11th Cir. 2019) ........ 20
*United States v. Gabrielian*,
2024 WL 2384148 (D. Md. May 22, 2024) ........ 20
*United States v. Kahl*,
No. CR 16-547, 2019 WL 2265572 (D.N.J. May 13, 2019) ........ 20
*United States v. Ruppel*,
666 F.2d 261 (5th Cir. 1982) ........ 19

*United States v. Vest*,
639 F. Supp. 899 (D. Mass. 1986) .......... 21

*Vortt Expl. Co. v. Chevron U.S.A., Inc.*,
787 S.W.2d 942 (Tex. 1990) .......... 26

Statutes

18 U.S.C. §§ 2510-2523 .......... 4

18 U.S.C. § 2511(2)(d) .......... 6, 7, 8, 20

42 U.S.C. §§ 1320d-5 .......... 22

42 U.S.C. § 1320d-6 .......... Passim

Rules

Fed. R. Civ. P. 56 .......... 6, 12

Defendant The Methodist Hospital d/b/a Houston Methodist Hospital respectfully moves for summary judgment. Because the facts uniformly establish that Houston Methodist used the Facebook Pixel without criminal or tortious intent, Plaintiffs cannot recover under the Electronic Communications Privacy Act (the Wiretap Act).

## I. Nature and Stage of Proceeding

Plaintiffs Edward and Marie Sweat brought this putative class action lawsuit complaining of Houston Methodist's prior use of the Facebook Pixel, a snippet of JavaScript code that facilitates digital marketing on websites.

Houston Methodist moved to dismiss the complaint. The Court dismissed the invasion of privacy claim but allowed claims under the Wiretap Act and for unjust enrichment to proceed. As the Court noted, the Wiretap Act imposes liability for intentionally intercepting electronic communications. 18 U.S.C. §§ 2510-2523. A party to its own communications ordinarily is not subject to liability under the Act. *Id.* § 2511(d). But the Act has an exception if "such communication is intercepted for the purpose of committing any criminal or tortious act," referred to as the crime-tort exception. *Id.* The Court invited Houston Methodist to renew its arguments at the summary judgment stage about whether it could be liable under the crime-tort exception to the Wiretap Act. *See* ECF 28.

On February 19, 2025, the Court entered an order bifurcating liability and class discovery and set a briefing schedule on the question of Houston Methodist's intent for purposes of the crime-tort exception of the Wiretap Act. *See* ECF 47.

Since then, Plaintiffs obtained broad discovery. Houston Methodist produced over 21,000 pages of responsive materials. Plaintiffs deposed seven current or former hospital employees, plus an employee of Houston Methodist's digital advertising agency. Every deponent confirmed what

is evident in the documents: Houston Methodist understood that the Pixel, and other tracking technologies, did not transmit individually identifiable data and could be used safely on its website.

Plaintiffs were deposed on April 25, 2025, shortly before the close of discovery. Neither Plaintiff has heard of the Facebook Pixel.[1] Plaintiffs also do not know whether they've been injured by Houston Methodist, and Mr. Sweat is generally happy with the care he has received.[2] Houston Methodist expects that any class certification briefing would address these plaintiffs' standing and adequacy as class representatives, relying, at least in part, on forthcoming expert testimony.

The first period of discovery closed on April 29, 2025.

## II. Statement of Issues and Standard of Review

First, did Houston Methodist have the requisite intent to be liable under the Wiretap Act? Plaintiffs allege criminal exposure arises from the Health Insurance Portability & Accountability Act (HIPAA), but they ignore the scienter requirement for a criminal violation. Because Houston Methodist did not knowingly disclose individually identifiable data through the Pixel, its conduct does not amount to a criminal HIPAA violation, and it cannot be civilly liable under the Wiretap Act.

Second, did Houston Methodist's business use of the Pixel, to obtain advertising analytics, satisfy the language of the Wiretap Act's crime-tort exception? This exception requires that the interception occurred "for the purpose of committing" a crime or tort. 18 U.S.C. § 2511(2)(d). Regardless of what data was captured via the Pixel, the Court must resolve whether Houston

[1] *See* E. Sweat Tr., Ex. 1, at 20:14-16 ("Q. Have you heard of the Meta Pixel, the Meta Pixel or the Facebook pixel? A. No, not really."); M. Garza-Sweat Tr., Ex. 2, at 35:3-10 ("Q. Have you heard of the Facebook Pixel or Meta Pixel? A. No.")

[2] *See* E. Sweat Tr., Ex. 1, at 100:10-101:3 ("I don't know if I've been harmed or not."); M. Garza-Sweat Tr., Ex. 2, at 89:2-4 ("Q. Can you identify any specific harm you've experienced? A. No."). E. Sweat Tr., Ex. 1, at 14:11-13 (quality of care); *see also* Am. Compl., ECF 6, at ¶ 112 ("Plaintiffs are currently and have been patients at [Houston Methodist].").

Methodist had a criminal or tortious purpose so as to fall "within the statutory exemption from liability." ECF 28, Mem. Op. at 8. Some courts have interpreted this crime-tort exception to require that the criminal or tortious purpose be independent from the interception itself. Other courts have interpreted the exception to require that a criminal or tortious purpose be the primary or motivating objective for the interception. Under either interpretation, Plaintiffs' claim cannot survive. Houston Methodist indisputably intended to use the Pixel to measure performance of its ad campaigns – not to commit a crime.

Third, if Houston Methodist's motion on the Wiretap Act claim succeeds, does Plaintiffs' unjust enrichment claim survive? Unjust enrichment generally is not a standalone cause of action. And where unjust enrichment has proceeded independently, it has been as a claim for quantum meruit that is entirely inapplicable to Plaintiffs' pleading and evidence.

Summary judgment is appropriate on each issue. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a). The "plain language" of Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its summary judgment burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. While the party moving for summary judgment must show the absence of a genuine dispute of material fact, it need not negate the elements of the nonmovant's case. The "*nonmoving* party cannot survive a summary

judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (cite omitted).

As set forth below, Plaintiffs cannot meet their burden to avoid summary judgment.

## III. Summary of the Argument

*First*, for Houston Methodist to be liable under the Wiretap Act, Plaintiffs must show that it committed, or intended to commit, a crime or tort through the alleged interceptions. *See* 18 U.S.C. § 2511(2)(d). Plaintiffs allege that use of the Pixel was a criminal HIPAA violation. The undisputed facts wholly refute the allegation.

A criminal HIPAA violation requires the *knowing* disclosure of personal health information to a third party. *See* 42 U.S.C. § 1320d-6(a)(3) ("A person who knowingly and in violation of this part [. . .] discloses individually identifiable health information to another person[] shall be punished[.]"). The idea that Houston Methodist knowingly disclosed individually identifiable health data is uniformly refuted by the record. The evidence shows that it did not know of, and certainly did not intend, any transmission of individually identifiable data to a third party.

*Second*, for liability under the crime-tort exception, Plaintiffs must show Houston Methodist intended to intercept communications "for the purpose of committing" a crime or tort. 18 U.S.C. § 2511(2)(d). The hospital's digital marketing team used the Pixel for the commercial purpose of obtaining ad campaign analytics, not to commit a crime or tort against the very patients they seek to serve.

Under the prevalent interpretation of this exception, the criminal or tortious purpose must be independent from the interception itself. Here, the alleged wrongdoing is the same act as the interception. As such, the Wiretap Act claim fails. Under an alternate interpretation of the crime-

tort exception applied by some courts, the criminal or tortious purpose must be the primary or motivating objective. The Wiretap Act claim also fails under this standard because Houston Methodist intended to use the Pixel for the primary and motivating business purpose of evaluating the performance of its ad campaigns.

*Third*, the unjust enrichment claim fails whether it is a method of recovery or independent basis of liability. Most Texas courts consider unjust enrichment to be a method of recovery, not an independent claim. As only a method of recovery, this claim fails if summary judgment is granted on the Wiretap claim. And if treated as an independent basis of liability, this claim is not a general cause of action to rectify wrongdoing but a limited method of recovery for unpaid services in a quasi-contractual relationship. Plaintiffs have not alleged, and there is no evidence to establish, any quasi-contractual right to recovery here.

## IV. Factual Background

### A. The Pixel is a tool for tracking website usage.

This complaint centers on Houston Methodist's use of the Pixel tool provided by Facebook (now Meta) for less than six months, from January to June 2022. *See* Am. Compl., ECF 6.

Historically, the term "pixel" comes from a tiny image (literally, the size of one pixel) embedded by a third party on a website. U. Devineni Tr., Ex. 3, at 59:19-23. When a web browser detected the pixel, it would reach out to the third party's website to retrieve the "image." *Id.* at 59:24-60:3 Today, tracking pixels no longer use a 1x1 image, but the technology works much the same. Through JavaScript code, a pixel allows websites to collect metadata from visitors that can be used to gather digital analytics. *Id.* at 60:4-8

### B. Houston Methodist used the Pixel to gather aggregated ad campaign data.

Houston Methodist is a major non-profit hospital group serving the greater Houston area. J. Kuczynski Tr., Ex. 4, at 46:14-17. According to U.S. News & World Report, it is recognized as

the #1 hospital in Texas, and it is on the Honor Roll of the best hospitals in the country. *See* Best Hospitals in Texas, U.S. News & World Report, available at https://health.usnews.com/best-hospitals/area/tx.

Houston Methodist provides a variety of valuable services to actual and potential patients through its website. U. Devineni Tr., Ex. 3, at 60:9-19; A. Martinez Tr., Ex. 5, at 18:4-18. The site offers information about doctors within the hospital system, links patients to healthcare provider information, and has webpages dedicated to informing visitors about medical locations and care. U. Devineni Tr., Ex. 3, at 60:9-19.

Through its digital marketing group, Houston Methodist works to develop and deploy public health campaigns. A. Martinez Tr., Ex. 5, at 18:4-18. Its marketing department sets out its overarching purpose as connecting patients to doctors in their time of need. *Id.* at 95:13-96:10; J. Effenson Tr., Ex. 6, at 78:12-24.

The digital marketing group used the Pixel to gather data on the performance of their ad campaigns and public health outreach. J. Kuczynski Tr., Ex. 4, at 47:12-48:2. The Pixel provided aggregated, anonymized, and unidentifiable analytics, such as the total number of page views or clicks on a particular button on its public webpages. *See, e.g.*, Houston Methodist Serv. Line Update, Ex. 7, at HM00005669. Unlike some hospitals, Houston Methodist never placed the Pixel inside MyChart, where patient electronic health records are accessible and sensitive communications between patients and the hospital may occur. *E.g.*, J. Duncan Tr., Ex. 8, at 28:10-20.

**C. Advertising agencies recommended that the hospital use the Pixel.**

In 2019, Houston Methodist hired Fathom SEO, a national digital ad agency with expertise in assisting healthcare providers. J. Duncan Tr., Ex. 8, at 30:23-31:22. The Pixel tool originally had been installed at the recommendation of Rise Interactive, Fathom's predecessor agency. *Id.*;

Email from J. Duncan, Ex. 14, at HM00005093-HM00005095; A. Milligan Tr., Ex. 9, at 33:20-34:5.

Fathom advised on management of the hospital's Facebook Business Manager portal. J. Duncan Tr., Ex. 8, at 30:23-31:22. Fathom agreed to have "qualified and licensed personnel" provide services "in accordance with all applicable laws, industry standards, and professional requirements." Fathom Master Servs. Agr., Ex. 10, at HM00000152. These services include the "proper implementation and firing of all program-related tracking" and providing digital analytics strategists to ensure "clean tracking." Fathom Statement of Work, Ex. 11, at HM00000166. Fathom advised Houston Methodist that the Pixel was safe for use on websites of healthcare providers. A. Milligan Tr., Ex. 9, at 34:3-12; J. Duncan Tr., Ex. 8, at 20:13-21:9. "Since health information is filtered out, and all data is hashed and randomized (meaning it can no longer be used to identify an individual,) Meta isn't collecting PHI" and "data that is deemed sensitive health information is not collected." B. Cohen Email, Ex. 12, at HM00005368.[3]

As digital healthcare marketing specialists, Fathom recommended ways to optimize the Pixel's analytics and ensure its proper implementation. Email from U. Devineni, Ex. 13, at HM00006352; Ex. 14, at HM00005093; J. Effenson Tr., Ex. 6, at 83:14-84:1. Fathom also monitored the day-to-day operations of Houston Methodist's Facebook ad campaigns. J. Duncan Tr., Ex, 8, at 18:10-19:2, 31:14-32:1. Fathom received the aggregated data reported by the Pixel and provided updates to the hospital on the performance of its campaigns. *See, e.g.*, Houston Methodist Serv. Line Update, Ex. 7, at HM00005669.

[3] Individually identifiable health information ("IIHI") is information that relates "to the past, present, or future physical or mental health or condition of an individual," or "the provision of health care to an individual," and "identifies the individual or for which there is a reasonable basis to believe it can be used to identify the individual." 42 U.S.C. § 1320d(6). Protected health information ("PHI") is IIHI that is held by a covered entity. 45 C.F.R. §160.103.

**D. Houston Methodist publicly disclosed its use of website tracking technology.**

Throughout this period, from at least April 2016 and throughout 2022, Houston Methodist included a privacy disclosure policy on its website. The policy described its use of tracking tools. "[W]e and third-parties may use a variety of technologies that automatically (or passively) store or collect certain information whenever you visit or interact with" the website. Privacy Policy, Ex. 15, at HM00000001. Among the list of tracking services included in the disclosure were web beacons—a technical term for pixels. *Id.*; U. Devineni Tr., Ex. 3, at 59:19-23. At the end of the policy, Houston Methodist lists specific tracking tools it used, including Google ad services, Google Tag Manager, and Facebook ad serving and retargeting ads. Privacy Policy, Ex. 15, at HM00000005-HM00000006.

On May 18, 2022, *The Markup*, a news site that covers large technology companies, reached out to Houston Methodist for comment on a story it planned to run on how hospitals around the country were using the Meta Pixel. T. Feathers Email, Ex. 16, at HM00007325. Reflecting its trust in the safety of the Pixel, Houston Methodist noted in response to the reporter's inquiry that it "believes Facebook 'uses tools to detect and reject any health information.'" Article, Ex. 17, at SWEAT000005.

In response to this outreach, Houston Methodist asked Fathom for more information on the Pixel's data filter. Fathom's response was clear: "Meta isn't collecting PHI" and "sensitive health information is not collected." B. Cohen Email, Ex. 12, at HM00005368.

Seeking further assurance that the Pixel was safe, Houston Methodist contacted Meta itself. B. Cohen Invite, Ex. 18, at HM00000978. It pressed Meta for details on how its HIPAA detection system worked. Email from J. Effenson, Ex. 19, at HM00001196- HM00001199 Meta took weeks to respond. Ultimately, it delivered highly sanitized non-answers. *Id.* at HM00001187, HM00001196-HM00001199. While waiting for more information from Meta, Houston Methodist

removed the Pixel from its website by June 6, 2022, ten days before *The Markup* article was published. Email from J. Duncan, Ex. 20, at HM00005232. As Houston Methodist explained to *The Markup*, and was quoted in the article, "Since our further examination of the topic is ongoing, we elected to remove the pixel for now to be sure we are doing everything we can to protect our patients' privacy while we are evaluating." Ex. 17, at SWEAT000005; S. Asin Tr., Ex. 21, at 46:19-24. *The Markup* published its article on June 16, 2022. *Id.*[4]

**E. Houston Methodist also fixed data leakages through vendor tools.**

Plaintiffs challenge Houston Methodist's use of the Pixel on its website, where they say they found doctors and accessed the patient portal. *See* Pltfs' Resp. to Interrog. 2, Ex. 22, at 5. Though not applicable to Plaintiffs or their claims in this lawsuit, Houston Methodist learned of two discrete instances where tools provided by partner vendors had possible leakages. In both instances, the hospital acted to solve the issue as soon as it was identified, demonstrating that its intent in using pixels and similar tools is not to commit a crime or tort against its patients.

First, in December 2021, a university researcher emailed Houston Methodist about potential risks associated with the placement of Google Analytics in MyChart, a patient portal tool provided by a third-party vendor.[5] Email from K. Levchenko, Ex. 23, at HM00017730. The researcher had determined that Google Analytics was placed on the MyChart log-in page, and Houston Methodist immediately investigated as it was not using any Google Analytics data related

[4] At summary judgment, factual statements in the article are inadmissible hearsay unless they can be introduced in admissible form. *See Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003); Fed. R. Civ. P. 56(c)(2).

[5] A declaration within Plaintiffs' own production shows that Google "ensure[s] Google Analytics data is pseudonymized through encryption, technological safeguards, and access restrictions" and does not use metadata like IP and URL addresses to identify users. S. Ganem Decl., Ex. 25, at SWEAT000124. Across its website, Houston Methodist had also configured Google Analytics to hash and anonymize IP addresses so that transmissions were unidentifiable. *See* Email from U. Devineni, Ex. 26, at HM00010790.

to MyChart (or its login page). *Id.* at HM00017727 ("[We] really appreciate what [the researcher's] team has been looking into and reaching out to us proactively."); *see also* U. Devineni Tr., Ex. 3, at 64:18-65:8. Houston Methodist determined that Google Analytics was not passing any individually identifiable information from MyChart except for a small subset of URLs related to the MyChart communications "preference center." The affected URLs (none of which related to Plaintiffs) did not reveal any patient treatment information but did contain potentially identifying contact information like email addresses or phone numbers.[6] U. Devineni Tr., Ex. 3, at 62:24-65:21. The fact that the URLs contained contact information was not a technical "best practice" and needed to be remedied by the MyChart team. *Id.*; U. Devineni Email, Ex. 23, at HM00017728. Beginning in December 2021 and through successive updates into early 2022, Houston Methodist worked to address the issue. Houston Methodist IT and digital marketing employees jointly worked to remove Google Analytics coding from within MyChart and ultimately from the MyChart log-in page.[7] Email from U. Devineni, Ex. 23, at HM00017728; Email from A. Martinez, Ex. 24, at HM00017664.

Second, in March 2022, Houston Methodist discovered an issue related to mammogram services. Email from U. Devineni, Ex. 27, at HM00017171. The hospital contracted with two third-party vendors, one to provide text message reminders for mammogram scheduling and the second

[6] There is no evidence that Google Analytics actually used these URL queries to identify users and, to the contrary, evidence that Google had extensive protections in place to avoid such identification. *See* S. Ganem Decl., Ex. 25, at SWEAT000124.

[7] In late January 2022, Houston Methodist sought to fix the leakage by deploying Google Analytics through Google Tag Manger exclusively at the login page – which the digital marketing team believed would allow for safe tracking only on non-authenticated pages. Email from U. Devineni, Ex. 23, at HM00017728. This deployment method remedied the preference center leakage, but the digital marketing team became concerned that URLs associated with post-authentication pages were still being captured. Email from U. Devineni, Ex. 31, at HM00017070. As a result of their ongoing concerns, Houston Methodist then removed all tracking from all MyChart properties, including the login page. Email from A. Martinez, Ex. 24, at HM00017664 ("This update will allow us to protect our consumers/patients data . . . .").

to provide an online booking tool. An integration between these vendors had resulted in a possible leakage beginning in February of 2022. When a person clicked on a text message to schedule a mammogram, the resulting URL included the patient's name so as to pre-populate certain booking fields on the third-party booking tool. I. Bartonico Email, Ex. 28, at HM00003574. In May 2022, Houston Methodist learned that this information in the URL potentially was passed to Facebook via the Pixel.[8] Email from U. Devineni, Ex. 27, at HM00017169. Upon discovering this issue, Houston Methodist removed the Pixel from imaging appointments and worked with the third-party vendor to prevent the URL from passing such personal information. Email from S. Strawn, Ex. 28, at HM00003563-HM00003574. Again, Plaintiffs' information is not included in the list of potentially affected visitors.

**F. Houston Methodist also audited all of the remaining tracking tools.**

Following *The Markup* article, Houston Methodist did an audit of all other tracking tools on its website. By the end of June 2022, it had paused all pixels on its website. *Id.* at HM00003560.[9]

On December 1, 2022, HHS issued guidance that covered entities may not use a third-party tracking tool on webpages unless the third party is subject to a business associate agreement (BAA), which requires the third party to protect any personal health information it receives. *See Use of Online Tracking Techs. by HIPAA Covered Entities & Bus. Assocs.*, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[8] As with Google Analytics, there is no indication that Facebook used information in the URL query to identify users.

[9] Houston Methodist did not pause Google Analytics until HHS's December 2022 guidance, consistent with its belief that the tool did not pass any identifying information because it hashed and anonymized IP addresses. *See* U. Devineni Tr., Ex. 3, at 65:9-17 ("As I said, we anonymize IP address for GA and there was no reason actually to be [concerned about Google Analytics on the main website]").

Houston Methodist promptly removed all remaining third-party tracking tools not subject to such an agreement from its main website, including Google Analytics.[10]

On June 20, 2024, a Fort Worth federal court vacated the HHS guidance as to non-authenticated webpages. *Am. Hosp. Ass'n v. Becerra,* 738 F. Supp. 3d 780 (N.D. Tex. 2024). The court found that "other courts have rejected HHS's interpretation"; multiple federal agencies themselves were violating HHS's own guidance by using third-party tracking tools; and "there's nothing close to unanimity between HIPAA-covered entities" on when tracking technologies may pass PHI. *Id.* at 794. Ultimately, the court held that visits to unauthenticated webpages do not "relate to" health conditions, as required by HIPAA, and the information used by tracking technologies was not per se "reasonably capable of being used to identify" a patient. *Id.* at 801-04. HHS dismissed its appeal of the decision. *Am. Hosp. Ass'n v. Becerra*, No. 24-10775 (5th Cir. dismissed Sept. 4, 2024).

Despite an evolving landscape, Houston Methodist tracking tools remain under a business associate agreement. L. Lopez Email, Ex. 29, at HM00017227.

## V. Argument and Authorities

### A. With No Criminal Intent, Houston Methodist Cannot Be Civilly Liable.

Houston Methodist believed that individually identifiable health data was not disclosed by the Pixel. That is critical. A criminal violation of HIPAA, which Plaintiffs allege here to establish civil liability, requires that a covered entity "knowingly" disclosed individually identifiable health information "without authorization." 42 U.S.C. § 1320d-6. Because Houston Methodist did not

[10] The operators of certain Houston Methodist subdomains, such as pages dedicated to academic research or donations to charitable events, initially did not believe that they were subject to this guidance because their pages did not relate to the provision of healthcare. *E.g.*, Email from A. Martinez, Ex. 30, at HM00017576. In early 2023, Houston Methodist's digital marketing team audited these subdomains and instructed any websites that patients might visit to remove Google Analytics in order to comply with the federal guidance. *Id.*

"knowingly" disclose individually identifiable health data in violation of HIPAA, it committed no crime that could subject it to liability under the Wiretap Act.[11]

### 1. Houston Methodist Believed the Pixel Transmitted No Individually Identifying Data.

Houston Methodist believed its use of the Pixel was lawful and compliant with HIPAA, as evidenced by the uncontradicted testimony of its employees and its digital ad agency.

To a person, Houston Methodist employees all testified that they understood and believed the Meta Pixel was safe. A. Martinez Tr., Ex. 5, at 107:4-16; J. Effenson Tr., Ex. 6, at 87:7-13, J. Duncan Tr., Ex. 8, at 32:22-25; J. Kuczynski Tr., Ex. 4, at 17:2-22; 47:5-11; U. Devineni Tr., Ex. 3, at 66:4-13; A. Milligan Tr., Ex. 9, at 34:13-20. Each employee explained that they did not believe that the Pixel was transmitting individually identifiable data. *Id.*[12]

Its digital marketing team understood the Pixel to be a HIPAA-safe tool commonly used in the healthcare industry. Its two retained healthcare digital marketing agencies, Rise Interactive and Fathom, recommended using the Pixel. J. Duncan Tr., Ex. 8, at 30:9-31:11. The hospital reasonably believed that Facebook would not make a tool available for healthcare companies if it could not be safely used by those companies. J. Effenson Tr. Ex. 6, at 87:14-88:10.

---

[11] Two state regulatory statutes cited in the Complaint are irrelevant for analysis of the crime-tort exception. The Texas Administrative Code and Texas Health Code constitute regulations for health providers, with enforcement conducted solely through state regulatory agencies. *See* Tex. Admin. Code § 133.121; Tex. Health & Safety Code Ann. § 181.153, 201. Under Texas law, there is no implied private cause of action for either. *See Carpenter v. Arredondo*, 714 F. App'x 416, 417 (5th Cir. 2018) (no private cause of action under "Texas law[s] concerning HIPAA compliance"); *Brown v. De La Cruz*, 156 S.W.3d 560, 565-66 (Tex. 2004) (disallowing implied private causes of action when statute delegates express enforcement power to Texas Attorney General or another regulatory agency). The only remaining "criminal" conduct that Plaintiffs identify is an alleged violation of HIPAA.

[12] The only employee who could not directly testify on this issue was Houston Methodist's communications director, because her role was limited to responding to *The Markup*. But even she confirmed that Houston Methodist's "number one goal was to be as truthful as – and transparent as we possibly could be" in its response. S. Asin Tr., Ex. 21, at 46:21-47:13. This includes their statement that Houston Methodist it was "'confident' in Facebook's safeguards and that the data being shared isn't protected health information." Article, Ex. 17, at SWEAT000005.

This belief in the Pixel's safety – specifically, that it did not capture individually identifying information – was confirmed by the data actually received from the Pixel's use. Houston Methodist got aggregated, campaign-level data showing how particular ad campaigns performed. *See, e.g.*, Houston Methodist Serv. Line Update, Ex. 7, at HM00005655-HM00005669. It could not see what any individual user did, nor could it see the individuals who comprised the aggregate totals. *Id.* Instead, it got overall campaign-level performance data. *Id.* This showed, for example, that 2078 users saw its "monthly reminder" on Facebook to schedule a mammogram, and 374 visited the website to take a "lead action" towards scheduling the mammogram:




| Campaigns | Spend | Impressions | CPM | Clicks | CTR | CPC | Lead Actions | Lead Action Rate | Cost / Lead Action |
|---|---|---|---|---|---|---|---|---|---|
| Evergreen | $10,605 | 121,637 | 87.19 | 1,128 | 0.93% | $9.40 | 109 | 9.7% | $97 |
| 40th Birthday | $452 | 36,434 | 12.41 | 118 | 0.32% | $3.83 | 32 | 27.1% | $14 |
| Monthly Reminder | $345 | 2,078 | 166.27 | 483 | 23.24% | $0.72 | 374 | 77.4% | $1 |

*Id.* at HM00005669; *see also* J. Duncan Tr., Ex. 8, at 18:10-19:20, 31:5-32:1.

Further, Houston Methodist only embedded the Pixel on public-facing websites, and never within its patient portal MyChart. This was consistent with its understanding that the Pixel could and did track only system-level, aggregated analytics, *i.e.*, button clicks and page loads, not individual activities. J. Duncan Tr., Ex. 8, at 9:15-21; 20:13-21:9; J. Effenson Tr., Ex. 6, at 49:14-50:8; A. Milligan Tr., Ex. 9, at 34:13-20.

**2. Houston Methodist's Statements and Actions Confirm Its Good Faith.**

Houston Methodist's belief that the Pixel was safe is reflected in its internal and public statements regarding tracking technology both before and after *The Markup* inquiry.

Before *The Markup* contacted the hospital, the Privacy Disclaimer on Houston Methodist's website told visitors that the site used tracking technology. It disclosed that it collected "Usage Information" like a user's IP address, unique identifier, and the URL that referred a visitor to the hospital. Houston Methodist would not have disclosed its use of tracking technology if it believed using it was a criminal violation of HIPAA. Privacy Policy, Ex. 15, at HM00000005-HM00000006. In fact, the disclosure confirms the hospital's belief that using the Pixel tool was lawful. This is understandable given uncertainty in the law on when and how tracking technology may be used. Indeed, "there's nothing close to unanimity between HIPAA-covered entities" on when tracking technologies may pass IIHI. *Am. Hosp. Ass'n,* 738 F. Supp. at 794.[13]

Houston Methodist's reaction to *The Markup* inquiry further proves its understanding of the Pixel tool. It promptly sought to investigate the reporter's inquiry and to understand what was transpiring and quickly removed the Pixel from its website.

Before hearing from *The Markup*, Houston Methodist had no idea the Pixel could pose compliance risks. But when the reporter said the Pixel allegedly could see a user's IP and URL address, the hospital sought to understand what mechanisms Facebook had in place to reject that data if the URL address contained sensitive health queries. J. Effenson, Tr., Ex. 6, at 42:23-44:8. Facebook's now-deleted 2022 guidance flatly stated that the Pixel *did* filter out sensitive data.

[13] For example, in 2018, the Department of Health and Human Services (HHS) affirmed the safety of the Facebook Pixel for use on its own healthcare websites including Medicare.gov, Medicaid.gov, and HealthCare.gov. *See* Third Party Websites and Applications Privacy Impact Assessment - Facebook Ads, HHS, (Sept. 4, 2018), available at https://www.hhs.gov/pia/third-party-websites-and-applications-pia-facebook-ads.html. The agency confirmed that the agency does not "receive, use, or maintain PII from" the Pixel and that the Pixel's only intended purpose was to provide "aggregated performance data in the form of statistical reports," and concluded that the Pixel "application is appropriate for [agency] use" on healthcare websites. *Id.*

> If Meta's signals filtering mechanism detects Business Tools data that it categorizes as potentially sensitive health-related data, the filtering mechanism is designed to prevent that data from being ingested . . . .

*About Sensitive Health Info.*, Facebook (captured Feb. 6, 2022), Ex. 32, at HM00021176.

Likewise, its digital marketing expert Fathom said the Pixel filter was fully functional, and its emails reflect this understanding in the wake of *The Markup* reaching out to the hospital. *See* B. Cohen Email, Ex. 12, at HM00005367. Houston Methodist had no reason to believe the Pixel captured IIHI and instead reasonably believed that the Pixel's data filter would block IIHI in the event of leakage. That's what Houston Methodist's consultants and Meta itself said.

Moreover, in two instances not applicable to Plaintiffs, when the hospital found instances of "leakage," where a visitor's personal data potentially was transmitted to a third party through a partner vendor's URL, it took swift action to address the situation. *See supra*, Section IV(E).

To fall within the crime-tort exception, Plaintiffs bear the burden to prove that Houston Methodist acted with criminal intent. *United States v. Ruppel*, 666 F.2d 261, 271 (5th Cir. 1982). Plaintiffs seek to carry their burden by focusing on the intentionality of the tool's implementation, not the intentionality of the alleged disclosure of IIHI. *See* Pls. Mem. in Opp. to Mot. to Dismiss, ECF 23, at 18. Their theory omits the *mens rea* requirement of HIPAA altogether. *See id.* at 16 (asserting that "disclosure and sale of health information is in itself a criminal act" under HIPAA, without quoting or even acknowledging this knowledge requirement).

Far from intending to disclose individually identifying health data, Houston Methodist did everything it could to avoid doing that and to rectify the two discrete situations that did arise. *See In re Pharmatrak, Inc. Priv. Litig.*, 292 F. Supp. 2d 263, 267-68 (D. Mass. 2003) (finding that incidents where personal data unintentionally was transmitted from website browsers amounted to negligence or gross negligence at worst, which is insufficient "to satisfy the specific intent requirement" under the Wiretap Act). Houston Methodist implemented the Pixel believing that it

did not transmit individually identifying data and was safe to use. Regardless of what data ultimately was captured by Facebook, any disclosure of IIHI was inadvertent at worst and not intentional, as a criminal violation of HIPAA would require.[14]

Tellingly, prosecutions under 42 U.S.C. § 1320d-6 almost exclusively involve the theft and sale of electronic health records to perpetrate an illegal scheme, such as committing identity fraud or receiving kickbacks for patient referrals.[15] Those prosecutions are categorically distinct from the facts here, which reflect an intent to comply with HIPAA but an industry-wide misunderstanding of the complex backend functionality of digital tracking technologies.

**B. Houston Methodist's Purely Commercial Purpose for Tracking Is Permissible.**

Houston Methodist never intentionally transmitted individually identifying data through the Pixel. But even if it had known that such information was transmitted to Facebook, its purpose in using the Pixel was to gather aggregate data for digital marketing and *not* to commit any crime.

[14] Plaintiffs repeatedly have shared their own medical details on their Facebook accounts and thus could be the source for any health information that is in Facebook's possession. *See* E. Sweat Facebook Comments Excerpt, Ex. 33 (showing three years of Facebook comments from Mr. Sweat detailing his medical care and procedures); E. Sweat Facebook Pages You've Liked Excerpt, Ex. 34, at 11 (Mr. Sweat publicly follows Houston Methodist on Facebook); M. Garza-Sweat Facebook Page Excerpt, Ex. 35, at 8 (using the Facebook "check-in" feature to note Plaintiffs' visit to Houston Methodist West Hospital in 2021); M. Garza-Sweat Contacts Shared with Instagram, Ex. 36 (sharing over twenty medical contacts with Instagram).

[15] *See United States v. Gabrielian*, No. CR SAG-22-336, 2024 WL 2384148, at *2 (D. Md. May 22, 2024) (sale of U.S. military health records to Russian government); *United States v. Coles*, No. 19 CR. 789 (PGG), 2023 WL 1865349 (S.D.N.Y. Feb. 9, 2023) (providing contact data for motor vehicle accident victims to corrupt medical clinics in exchange for millions in kickbacks); Indictment at 1-34, *United States v. Schlifstein*, No. 1:18-cr-217-KMW (S.D.N.Y. Mar. 15, 2018) (alleging physicians distributed patient data as part of conspiracy with pharmaceutical company to over-prescribe fentanyl spray in exchange for kickbacks); *United States v. Kahl*, No. CR 16-547, 2019 WL 2265572 (D.N.J. May 13, 2019) (sale of patient data in exchange for illegal kickbacks); *United States v. Corbett*, 921 F.3d 1032, 1035 (11th Cir. 2019) (sale of patient Social Security numbers, dates of birth, and other identifying data to open credit card accounts in patients' names and commit identity fraud); *Martin v. United States*, 889 F.3d 827 (6th Cir. 2018) (nurse accessed and disclosed a patient's medical records to fabricate evidence to support a fraudulent probate claim).

To show a Wiretap Act violation, Plaintiffs must introduce evidence showing that Houston Methodist deployed the Facebook Pixel "for the purpose of" committing a crime or tort. 18 U.S.C. § 2511(2)(d). Courts diverge in their interpretation of this statutory language. Some circuits require that a defendant must intend to commit "a tortious or criminal act that is independent of the intentional act of recording." *Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010); *see also In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 144-45 (3d Cir. 2015) (exception does not apply when "the tortious conduct is the alleged wiretapping itself."); *Sussman v. Am. Broad. Cos.*, 186 F.3d 1200, 1202 (9th Cir. 1999) (purpose must be for "facilitating some further impropriety, such as blackmail"); *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1095 (W.D. Wash. 2024) (in context of Meta Pixel, "Plaintiff points to no legal authority providing that the exception to § 2551(2)(d) is triggered when, as here, the tortious conduct is the alleged wiretapping itself.") (cite omitted). Other courts require that the "primary motivation" or "determinative factor" in the interception must be to commit a crime or tort. *See, e.g.*, *United States v. Vest*, 639 F. Supp. 899, 904 (D. Mass. 1986), *aff'd*, 813 F.2d 477 (1st Cir. 1987).

Under either standard, the Wiretap Act claim here fails. Regardless of whether the Act requires a crime or tort independent from the interception, or a crime or tort that is the motivating or primary purpose for the interception, Plaintiffs' claim cannot square with the overwhelming evidence that Houston Methodist installed the Pixel for a legitimate business purpose.

### 1. Houston Methodist Had No Independent Criminal/Tortious Purpose.

Under the first standard, Plaintiffs cannot show any "further impropriety" apart from the alleged violation itself. That is because the alleged crime of violating HIPAA is the same act as the alleged Wiretap Act violation: the simultaneous interception and transmission of data via the Facebook Pixel.

Indeed, some courts have held that the Wiretap Act requires a crime/tort independent of the interception and transmission, because otherwise the Act would supersede HIPAA for all digital communications with a hospital. *See Roberts v. Charlotte Mecklenburg Hosp. Auth.*, No. 3:24-CV-00382-KDB-SCR, 2025 WL 880538, at *3 n.1 (W.D.N.C. Mar. 20, 2025) (dismissing Wiretap Act claim as an "attempted end run around HIPAA's limitations to seek relief for the same alleged harm"), *appeal docketed* No. 25-1420 (4th Cir. Apr. 18, 2025). Conflating Wiretap Act and HIPAA violations would have the perverse effect of undermining HIPAA's own enforcement scheme.[16]

Specifically, HIPAA allows no private right of action. *See Acara v. Banks*, 470 F.3d 569, 571 (5th Cir. 2006) ("HIPAA does not contain any express language conferring privacy rights upon a specific class of individuals."). Instead, Congress elected to vest enforcement power with HHS and imposed limits on what remedies the agency may seek. *See* 42 U.S.C. §§ 1320d-5–1320d-6.[17] But if the Wiretap Act becomes a back door to civil liability based on a purported HIPAA violation, then hospitals will be mired in the exact kind of private litigation that Congress meant to avoid. In short, Plaintiffs' theory of Wiretap Act liability runs contrary to the regulatory scheme of HIPAA, imposing limitless civil liability without regard for the degree of culpability or whether the violation was rectified. *Araya v. McLelland*, 525 F.2d 1194, 1196 (5th Cir. 1976) ("[W]hen possible, statutes should be construed so as not to be in conflict with each other.").

---

[16] "No penalty may be imposed" and "no damages obtained" under HIPAA against a defendant who also faces criminal liability under 42 U.S.C. § 1320d-6. *See* 42 U.S.C. § 1320d-5(b)(1). Plaintiffs turn this statute on its head, seeking damages *only if* Houston Methodist criminally violates Section 1320d-6.

[17] Congress also set up a tiered regulatory scheme to assess penalties based on the level of culpability and whether the healthcare provider rectified the issue. *See* 45 C.F.R. § 102.3 (displaying the Penalty Adjustment Table used to assess fines). For willful violations where the covered entity remedies the issue, total annual liability is capped at $2,134,831. *See* 89 Fed. Reg. 64815 (Aug. 8, 2024).

In addition, Plaintiffs' theory undercuts the language and purpose of the Wiretap Act. The statute has no general private right of action but "limit[s] the cause of action to instances where one party to the conversation deliberately seeks to harm the other participant through the information intercepted." *Caro*, 618 F.3d at 100. "A simultaneous tort arising from the act of recording itself is insufficient." *Id.*

Here, the evidentiary record does not bear out any independent wrongful purpose. Houston Methodist used the Pixel solely to gather aggregated digital marketing analytics. Houston Methodist did not act with a separate, injurious purpose even if the Pixel's use allegedly "resulted in" a HIPAA violation. *See id.* ("Had Congress intended for the act of recording itself to provide the tortious intent necessary, it could have chosen to define the exception in terms of interception of oral communications *resulting in* a tortious or criminal act."). The Court should reject Plaintiffs' ill-advised theory of Wiretap Act liability and interpret the Act to require "a tortious or criminal act that is independent of the act of recording." *Id.*

**2. Houston Methodist Had No Criminal or Tortious Purpose.**

Even under the second standard, the Wiretap Act claim fails. Houston Methodist used the Pixel for commercial reasons, to provide analytical reporting on its campaigns' performance. As noted above, there is no evidence that Houston Methodist ever understood individually identifiable data was transmitted to the Pixel.[18] But if Houston Methodist somehow were to have known that such data was transmitted, the record conclusively refutes that it intended such a consequence. *See In re Pharmatrak, Inc.*, 329 F.3d 9, 23 (1st Cir. 2003) (intent element under Wiretap Act means

[18] Even viewing Plaintiffs' evidence in the most favorable light, it is far from evident that the Pixel did routinely intercept IIHI. The Pixel was only placed on public, non-authenticated webpages. And visits to public, non-authenticated webpages do not entail IIHI under HHS regulations and guidance as a matter of law. *See Am. Hosp. Ass'n,* 738 F. Supp. at 801-04.

the crime-tort exception only applies when the crime or tort is a party's "conscious objective") (quoting S. Rep. No. 99–541, at 23 (1986)). There is absolutely no evidence to suggest that Houston Methodist put the Pixel in place *in order to* commit a criminal HIPAA violation.

In fact, Houston Methodist employees were utterly clear that their paramount objective was to protect patients and their privacy. A. Martinez Tr., Ex. 5, at 100:17-101:22; J. Effenson Tr., Ex. 6, at 32:5-33:2; J. Duncan Tr., Ex. 8, at 22:5-18; J. Kuczynski Tr., Ex. 4, at 13:18-14:13; 17:2-22; A. Milligan Tr., Ex. 9, at 23:12-24:8; 33:20-34:20. Operating with that principle in mind, its digital marketing team worked to connect patients to doctors in their time of need. A. Martinez Tr., Ex. 5, at 95:13-21. Prior to May 2022, the Pixel facilitated this purpose, allowing the hospital to track how its Facebook outreach for healthcare services had done. Its reason for using the Pixel was to gain effective insights into the efficacy of its public health campaigns. J. Kuczynski Tr., Ex. 4, at 46:21-48:2. And while the Pixel had a business purpose, it did not result in financial gain. J. Effenson Tr., Ex. 6, at 78:25-80:23.

Houston Methodist's actions uniformly show an intent (and strenuous efforts) to comply with HIPAA, not violate it. When HHS updated its guidance in late 2022 to regulate third-party tracking tools, the hospital promptly removed any remaining tools outside of a business associate agreement. Email from J. Effenson, Ex. 37, at HM00016802. When the hospital began to question operation of the Pixel, it took down the tool from its websites. Email from U. Devineni, Ex. 20, at HM00005232. When it discovered patient data in URL addresses, it worked to fix the URLs and removed the corresponding tracking tools. Email from S. Strawn, Ex. 28, at HM00003564-HM00003574.

These are but some of the countless instances in which the hospital stressed compliance with HIPAA. Its undisputed conduct rebuts any allegation that Houston Methodist acted with the

deliberate purpose of violating HIPAA. Indeed, the very mission of its marketing department is to serve patients by connecting them to doctors in times of need. A. Martinez Tr., Ex. 5, at 95:13-96-10; J. Effenson Tr., Ex. 6, at 78:12-24. Patient privacy and safety are core to that mission. J. Effenson Tr., Ex. 6, at 44:9-21, 89:19-91:7. Even if individually identifiable data were transmitted in error, the record evidence is undeniable that Houston Methodist never acted with the "conscious objective" of transmitting such information when it employed the Facebook Pixel as a tracking tool. *In re Pharmatrak*, 329 F.3d at 23. As the hospital's privacy officer testified,

> Houston Methodist wanted to get counts, how effective is their outreach? The goal always – it's our mission – is to provide high quality care to the community. And if you're going to do outreach, you want to make sure it's effective and you're reaching that community. . . . [The Pixel] was just a count to know whether or not [outreach] was effective. There's no other benefit to Houston Methodist for having done this.

J. Kuczynski Tr., Ex. 4, at 47:12-48:2

Finally, Houston Methodist could not have acted with the conscious objective of transmitting IIHI when it did not even know such transmissions were possible. A Milligan Tr., Ex. 9, at 34:18-19. Houston Methodist did not believe, or have reason to believe, that using the Pixel would pass IIHI. As *The Markup* article itself notes, a third of the country's top hospitals then used the tool. Fathom believed the tool did not transmit IIHI, and it specializes in digital marketing for healthcare companies. J. Duncan Tr., Ex. 8, at 31:5-13; B. Cohen Email, Ex. 12, at HM00005368. Federal healthcare agencies themselves have used tracking tools, and even now, "there's nothing close to unanimity between HIPAA-covered entities" on when tracking technologies may pass IIHI. *Am. Hosp. Ass'n*, 738 F. Supp. at 794.

Because the Pixel tool was used across the industry and not clearly proscribed, Houston Methodist cannot be civilly liable under the Wiretap Act. That is all the more true in this circuit,

where the civil and criminal components of the Act "must be strictly construed, to avoid ensnaring behavior that is not clearly proscribed." *Simpson v. Simpson*, 490 F.2d 803, 809 (5th Cir. 1974).[19]

### C. Plaintiffs' Unjust Enrichment Claim Fails as Well.

The unjust enrichment claim is tethered to the Wiretap Act allegations. *See* Mem. Op., ECF 28, at 9 ("Because the court has allowed the statutory claim to proceed, there is no basis to dismiss the unjust enrichment claim at this time."). Unjust enrichment typically is not considered a standalone claim. *Harris Cnty. Texas v. MERSCORP Inc.*, 791 F.3d 545, 561 (5th Cir. 2015) ("unjust enrichment is not an independent claim"); *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*, 999 F.3d 970, 972 (5th Cir. 2021) (same). If the Court grants summary judgment on the Wiretap Act claim, there is no basis for the unjust enrichment claim to survive.

Beyond that, there's no evidence to support such a claim. "Unjust enrichment 'characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances that give rise to an implied or quasi-contractual obligation to pay.'" *Sullivan v. Leor Energy LLC*, 600 F.3d 542, 550 (5th Cir. 2010) (cites omitted). When permitted as a standalone claim, unjust enrichment only allows a plaintiff to bring a quantum meruit claim under an implied contract when services are rendered or work done in a quasi-contractual setting. *See, e.g.*, *Clingman & Hanger Mgmt. Assocs. LLC v. Rieck*, 701 F. Supp. 3d 565, 594-95 (S.D. Tex. 2023).

That paradigm is entirely misplaced here. Plaintiffs' pleadings and evidence do not show anything close to an unpaid debt for their services or work. To the contrary, they never expected to be paid for data that they otherwise say was unknowingly taken from them, where any purported

---

[19] The Eleventh Circuit overruled the holding of Simpson as it relates to certain wiretapping liability, *Glazner v. Glazner*, 347 F.3d 1212 (11th Cir. 2003), but it remains precedent in the Fifth Circuit.

value was supposedly provided to Facebook and not Houston Methodist, and when the hospital was not aware the data was passed. *See Vortt Expl. Co. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990) (unjust enrichment requires a "promise implied by law to pay for beneficial services rendered and knowingly accepted") (cites omitted). Nor is this some sort of catch-all claim. "Unjust enrichment is not a proper remedy merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss to the claimant . . . ." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992) (cites omitted).

As a theory of recovery or standalone claim, the unjust enrichment claim fails.

## VI. Conclusion

The Court should grant summary judgment for Houston Methodist on Plaintiffs' last two claims.

Dated: May 2, 2025

Respectfully submitted,

*/s/ R. Paul Yetter*
R. Paul Yetter
State Bar No. 22154200
pyetter@yettercoleman.com
Tracy N. LeRoy
State Bar No. 24062847
tleroy@yettercoleman.com
Mary E. Bracewell
State Bar No. 24139388
mbracewell@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR DEFENDANT
THE METHODIST HOSPITAL

**CERTIFICATE OF SERVICE**

I certify that on May 2, 2025 a copy of the foregoing was served via email or the Court's ECF service to all counsel of record.

*/s/ R. Paul Yetter*
R. Paul Yetter