**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| EDWARD SWEAT, and MARIE GARZA-SWEAT individually and on behalf of a class of similarly situated individuals, | ) | **No. 4:24-cv-00775** |
| *Plaintiffs*, | ) | **Assigned to Hon. Lee H. Rosenthal** |
| v. | ) | |
| HOUSTON METHODIST HOSPITAL, | ) | |
| *Defendant.* | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(filed under seal)**

Date: June 6, 2025

Paul O. Wickes
State Bar No. 00788663
**WICKES LAW, PLLC**
5600 Tennyson Parkway, Ste. 205
Plano, Texas 75024
(972) 473-6900
(972) 767-3225 FAX
pwickes@wickeslaw.com

Eugene Y. Turin (*S.D. Tex.* # 3874901)
Illinois Bar No. 6317282
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
eturin@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiffs and the putative class*

# TABLE OF CONTENTS


I. INTRODUCTION AND SUMMARY OF THE ARGUMENT ....................................1

II. PROCEDURAL BACKGROUND ....................................................................2

III. RELEVANT FACTS ....................................................................................4

A. Defendant's Implementation of the Meta Pixel on its Website...............................4

B. The Information Collected By The Meta Pixel Constitutes IIHI ............................5

C. Defendant Knew That The Meta Pixel Was Disclosing IIHI To Facebook............6

D. Defendant Did Not Take Any Precautions When Implementing The Meta Pixel .7

E. Defendant Implemented The Meta Pixel For A Commercial Advantage ..............8

F. Plaintiffs' Interactions With Defendant's Website..................................................9

IV. LEGAL STANDARD ..................................................................................10

V. ARGUMENT...............................................................................................10

A. There Is A Genuine Issue Of Material Fact Whether Defendant Had Knowledge That The Meta Pixel Was Sharing Individuals' IIHI With Facebook.................10

B. Plaintiffs Have Raised a Genuine Issue of Material Fact as to Whether Houston Methodist Acted With a Criminal or Tortious Purpose........................................13

VI. CONCLUSION ...........................................................................................18

# TABLE OF AUTHORITIES

**Case** **Page(s)**

*Boudreaux v. Swift Transp. Co., Inc.*,
402 F.3d 536 (5th Cir. 2005) ....................18

*B.K. v. Desert Care Network*,
No. 23-cv-05021-SPG, 2024 WL 1343305 (C.D. Cal. 2024)....................14

*Brown v. Learfield Communications, LLC*,
o. 23-cv-00374, 2024 WL 3676709 (W.D.Tx. 2024) ....................14

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010)....................13, 14

*Duke v. Univ. of Tex. at El Paso*,
663 F.2d 522 (5th Cir. 1981) ....................16

*Cooper v. Mount Siani Health Sys., Inc.*,
742 F. Supp. 3d 369 (S.D.N.Y. 2024)....................17

*Evans v. City of Marlin, Tex.*,
986 F.2d 104 (5th Cir. 1993) ....................10

*Forsyth v. Barr*,
19 F.3d 1527 (5th Cir. 1994) ....................16

*Hartley v. University of Chicago Medical Center*,
No. 22-cv-5891, 2024 WL 1886909 (N.D. Ill. Apr. 2024)....................14

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001)....................13, 17

*In re Grp. Health Plan Litig.*,
--- F. Supp. 3d ---, 2023 WL 8850243 (D. Minn. 2023)....................3, 14

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................13

*Kane v. University of Rochester*,
No. 23-cv-6027, 2024 WL 1178340 (W.D.N.Y. 2024)....................14

*Kurowski v. Rush Sys. for Health*,
No. 22-cv-5380, 2023 WL 8544084 (N.D. Ill. Dec 2023)....14, 15

*Lugo v. Inova Health Care Services*,
No. 24-cv-00700, 2025 WL 905191 (E.D. Va. 2025) ....14

*Mekhail v. North Memorial Health Care*,
No. 23-cv-00440, 2024 WL 1332260 (D. Minn. 2024)....14

*Sussman v. American Broadcasting Cos.*,
186 F.3d 1200 (9th Cir. 1999) ....13, 17

*Triple Tee Golf, Inc. v. Nike, Inc.*,
485 F.3d 253 (5th Cir. 2007) ....10

*United States v. Dale*,
991 F.2d 819 (D.C. Cir. 1993)....13

**Statutes**

18 U.S.C. § 2510....2

18 U.S.C.A. §2511(d) ....3, 13

42 U.S.C. § 1320d-6 ....2, 5, 13, 15, 16

**Other Authorities**

www.dhcs.ca.gov/dataandstats/data/Pages/ListofHIPAAIdentifiers.aspx....5

Plaintiffs Edward Sweat and Marie Garza Sweat, individually and on behalf of all similarly situated individuals, ("Plaintiffs"), by and through their undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby respond to Defendant's Motion for Summary Judgment (Dkt. 52) (the "Motion") and state as follows:

## I. INTRODUCTION AND SUMMARY OF THE ARGUMENT

Defendant's Motion for Summary does not argue that Defendant did not implement the third-party Meta Pixel tracker on its website. Nor does Defendant's Motion argue that the Meta Pixel did not disclose patients' health information. The only argument raised in Defendant's Motion is that Defendant did not "knowingly" and "intentionally" violate HIPAA requirements for health care providers to maintain the confidentiality of their patients' health data. However, the discovery produced to-date directly contradicts Defendant's arguments and, at a minimum, raises genuine issues of material fact. Specifically, as explained in more detail below, while Defendant was explicitly informed by the MarkUp article in June 2022 that the Meta Pixel was disclosing its website visitors' protected individually identifiable health information ("IIHI"), as Defendant itself admits in its Motion, Defendant has been receiving "aggregate" data from its Meta Pixel for years preceding the article. While Defendant continuously argues that *it* only ever received "aggregate" anonymized data that did not disclose any patients' IIHI, conspicuously missing from Defendant's assessment is the crux of Plaintiffs' claims regarding what data Defendant disclosed *to* Facebook through the Meta Pixel that enabled Facebook to create the aggregated data. Indeed, the "aggregate" data that Defendant received could necessarily only ever be created as a result of individual interactions with its website that were tracked and disclosed through the Meta Pixel on a per-patient basis. Defendant cannot simply plead ignorance and that it never "knew" that it was disclosing patient data simply because it failed to ever look into how it was being provided the

data that it used to run its marketing campaigns. Moreover, Defendant's own privacy policy, as well as disclosed made to Defendant about the "filter" that Facebook supposedly implemented to keep IIHI from being used by it evidence that Defendant did in fact know that IIHI was being disclosed to Facebook.

Moreover, Defendant's argument that it did not *intentionally* violate HIPAA such that Plaintiffs' claim under the Electronic Communication Privacy Act, 18 U.S.C. § 2510 *et seq.* ("ECPA") should be dismissed ignores the relevant HIPAA provision at issue. Under 42 U.S.C. § 1320d-6(b)(e)(3), it is a violation of HIPAA to disclose IIHI without authorization with "intent to . . . use [it] for commercial advantage." As such, the fact that Defendant, as admitted to in its own Motion, implemented the Meta Pixel for a "commercial advantage" of operating its marketing campaigns, is itself evidence that Defendant intentionally violated HIPAA. Moreover, this intentional act was separate and apart from Defendant's actual placement of the Meta Pixel.

For these reasons and those stated in further detail below, Defendant's Motion for Summary Judgment should be denied.[1]

## II. PROCEDURAL BACKGROUND

As alleged in Plaintiffs' operative First Amended Complaint ("FAC"), this case arises from Defendant's utilization of a Meta Pixel tracking tool on its website. (*See* Dkt. 6 at ¶¶ 7, 10–11.) Specifically, as the independent investigative agency "the Markup" found, Defendant was one of the 33 of the top 100 hospitals in the country that was utilizing a Meta Pixel on its website. (*Id.* at ¶¶ 53–54.) As the Markup found, by using a Meta Pixel on its website, whenever someone interacted with Defendant's website, including specifically such features as the "Find a Doctor"

---

[1] Plaintiffs do not dispute that Defendant did not actually sell the IIHI that it collected for a profit such that they do intend to proceed with their claim for unjust enrichment.

feature, information regarding their interaction was automatically sent to Facebook. (FAC at ¶ 55.) Plaintiffs, both of whom are patients who have received medical care with Defendant and regularly used its website, alleged that Defendant's use of the Meta Pixel violated HIPAA's regulations prohibiting the disclosure of IIHI without authorization and, as a result, violated the ECPA. (*Id.* at ¶¶ 112–115, 168–176.)[2]

Defendant responded to Plaintiffs' First Amended Complaint by filing its Motion to Dismiss. (Dkt. 14.) Defendant's Motion to Dismiss primarily argued that Plaintiffs failed to allege that Defendant "intercepted" Plaintiffs' communications by implementing the Meta Pixel for the "purpose of committing any criminal or tortious act." (*Id.* at 11 (citing 18 U.S.C.A. §2511(d)). The ECPA generally prohibits entities from "intercepting" electronic communications. *See* 18 U.S.C.A. §2511(1)(a)–(e). However, the ECPA is a one-party consent statute such that it is not unlawful for a party to the communication – such as Defendant here – to implement technology that intercepts individuals' communications with Defendant. *See* 18 U.S.C. § 2511(d). The exception to the one-party consent provision is when a communication is intercepted for the "purpose" of committing "any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." *Id.* This is called the "crime-tort exception." After full briefing on Defendant's Motion to Dismiss, the Court ultimately denied the motion and found that Plaintiffs' sufficiently pled that the crime-tort exception applied because "a purpose of the disclosure 'was to commit wrongful and tortious acts, namely the use of patient data for advertising in the absence of express written consent, and the use for marketing and revenue generation . . . in violation HIPAA." (Dkt. 28 at 7–8) (quoting *In re Grp. Health Plan Litig.*, No. 23-cv-267, 2023

[2] Plaintiffs also alleged that Defendant's actions constituted an invasion or privacy and resulted in unjust enrichment, but neither of those claims are currently at issue for decision before this Court.

WL 8850243, at *8 (D. Minn. Dec. 21, 2023)). Nonetheless, the Court ultimately reserved for summary judgement the issue of whether "Methodist's purpose in intercepting patient data falls within the statutory exemption from liability, even though the hospital disclosed individually identifiable patient information to a third party." (Dkt. 28 at 8.)

## III. RELEVANT FACTS

### A. Defendant's Implementation of the Meta Pixel on its Website.

Beginning sometime in 2017 and until approximately June 2022 Defendant implemented a Meta tracking Pixel on its website.[3] Specifically, the Meta Pixel was implemented on all "public-facing pages on houstonmethodist.org."[4] This included specifically the Meta Pixel being implemented on pages that allowed individuals to find a specific doctor, request an appointment, or that related to specific medical conditions.[5] The Meta Pixel collected and transferred to Facebook certain details about users' interactions with Defendant's website. Specifically, the Meta Pixel would collect and transmit to Facebook, amongst other data points, the following information: IP addresses; "[redacted];[6] [redacted]."[7] "In addition, if a

---

[3] Transcript excerpts of April 24, 2025 Deposition of Jeremy D. Mathis, attached hereto as Exhibit A, at 36:18–37:1; *The Markup: Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, SWEAT000001–6, attached hereto as Exhibit B, at SWEAT000005.

[4] Transcript excerpts of April 11, 2025 Deposition of Jacqueline Effenson, attached hereto as Exhibit C, at 28:21–24; Third Party Tags – Listing, HM00013120, attached hereto as Exhibit D; List of Google Tag Manager tag and trigger items, HM00000269, attached hereto as Exhibit E.

[5] *See* Ex. E; Online Privacy Evaluation, HM00013897–13902, attached hereto as Exhibit F, at HM00013901; Transcript excerpts of April 15, 2025 Deposition of Jeff Duncan, attached hereto as Exhibit G, at 11:21–12:3; May 18, 2022 Email to Stefanie Asin, HM00007325–7328, attached hereto as Exhibit H.

[6] *The Meta Pixel – health care background + Fathom's recommendation*, FATHOM000001–3, attached hereto as Exhibit I, at FATHOM000001–2; Duncan Dep., Ex., G, at 20:13–21:4.

[7] May 19, 2022 email to Jacqueline Effenson, HM00006379–6384, attached hereto as Exhibit J, at

patient is logged in to Facebook when they visit a hospital's website where a Meta Pixel is installed, some browsers will attach third-party cookies–another tracking mechanism–that allow Meta to link pixel data to specific Facebook accounts."[8]

**B. The Information Collected By The Meta Pixel Constitutes IIHI.**

HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that— (A) is created or received by a health care provider . . and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual . . . and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6). As such, information tracked by the Meta Pixel that a patient or potential patient looked up a doctor for treatment on Houston Methodist's website using the find a doctor feature, and/or scheduled a doctor's appointment, would satisfy all of the requirements. Such information would have been "created or received" by Houston Methodist, which is without question a "health care provider." Furthermore, the information relates to the "past, present, or future physical or mental health or condition of an individual" as well as "the provision of health care" to them. Finally, the fact that, as noted above, the Meta Pixel transmitted individuals' IP addresses as well as their unique Facebook IDs tying them back to their actual Facebook account, makes the information tracked identifiable. Indeed an IP address alone is listed as one of 18 potential unique identifiers under HIPAA guidelines.[9] As such, as Plaintiffs' Rebutal Expert Witness, the former Chief Medical Officer of a major medical healthcare network in Florida, stated, the

---

HM00006379, HM00006382.

[8] Ex. B at SWEAT000003.

[9] www.dhcs.ca.gov/dataandstats/data/Pages/ListofHIPAAIdentifiers.aspx.

information disclosed by Houston Methodist to Facebook through the Meta Pixel "would be IIHI and HIPAA prohibits its disclosure without authorization."[10]

### C. Defendant Knew That The Meta Pixel Was Disclosing IIHI To Facebook.

Defendant claims that *Defendant* only ever received "aggregate" anonymized data from its use of the Meta Pixel. (MSJ at 6, 7, 14.) However, Defendant ignores the fact that the aggregate data it received was only compiled as a result of *Facebook* receiving data as to *individual* site visitor's interactions through the Meta Pixel. Indeed, the Meta Pixel installed on Defendant's website tracked *individual* users' "intent action or conversion . . . clicking on a button on the site to indicate that they're going to [i.e.] schedule an appointment."[11] This is further supported by the fact that the Meta Pixel scripts that Defendant implemented were set to track individual user interactions with specific healthcare related pages such as filling out a form for a "Lung Cancer Screening."[12]

Moreover, Defendant's own privacy policy makes clear that Defendant knew that the Meta Pixel was sending Facebook data about specific unique individual users. While Defendant tries to hide behind its privacy policy as a shield (*see* MSJ at 15), a thorough reading of the policy discloses that Defendant "may associate Tracking Technology with *you* when *you* are on our Service to enable us to send *you* ads about us when *you* are on third party sites or services, and we may use third-party analytics . . . to . . . provide . . . third parties with information about the use of the Service."[13] Critically, Defendant's Privacy Policy specifically points to "Facebook" as the entity

---

[10] *See* Rebuttal Declaration of J. Richard Ludgin, attached hereto as Exhibit K, at ¶¶ 9–10.
[11] Duncan Dep., Ex. G, at 11:21–12:6; Effenson Dep., Ex. C, at 46:11–47:6, 86:19–87:6; Mathis Dep., Ex. A, at 105:24–107:1.
[12] Ex. E at 2 ("<script>fbq('track', 'Lung Cancer Screening Form');</script>").
[13] Privacy and Disclaimer, HM00000001–6, attached hereto as Exhibit L, at HM00000003 (emphasis added).

that provided it such "Ad serving and retargeting Ads."[14]

While Defendant also tries to hide behind the purported "filter" that Facebook claimed to have implemented to prevent IIHI from being sent to Facebook (*see* MSJ at 15–16), this too further supports a finding that Defendant knew that the Meta Pixel was sending IIHI to Facebook.[15] Specifically, the disclosure by Facebook does not state that the Meta Pixel never sends the different types of "health-related data about an individual that's considered sensitive" to Facebook, rather it specifically states that "the filtering mechanism is designed to prevent that data from being ingested into our ads ranking and optimization systems."[16] As such, at best, even if the filtering system operated properly, the "health-related data" listed therein was still being sent to Facebook, where it would be processed in some unknown and undisclosed fashion, and would only be kept out of its "ads ranking and optimization systems."[17]

### D. Defendant Did Not Take Any Precautions When Implementing The Meta Pixel.

Despite being a major provider of health services for thousands of individuals in Texas that was required to maintain compliance with HIPAA, Defendant failed to take basic measures to ensure that it was not disclosing its patients' IIHI to third parties. As Defendant itself admits, despite having implemented the Meta Pixel in 2017,[18] it did not take any steps to investigate how the Meta Pixel operated until The Markup contacted Defendant in advance of releasing its article in June 2022. (*See* MSJ at 15 "Before hearing from *The Markup*, Houston Methodist had no idea the Pixel could pose compliance risks").[19] But it is little wonder that Defendant did not have any

[14] *Id.*
[15] *See* Exhibit 32 to MSJ, attached hereto as Exhibit M.
[16] *Id.*
[17] *Id.*
[18] Ex. B at SWEAT000005.
[19] *See also* Effenson Dep., Ex. C, at 42:23–43:17.

idea that the Pixel would pose any compliance risks when Defendant did not implement any compliance efforts before implementing it. Indeed, Defendant did not have any formal process to review whether the Meta Pixel was potentially sending patients' IIHI in violation of HIPAA until *after* The Markup article was published.[20] Nor did Defendant take any effort to determine how Facebook was able to provide it the "aggregate" data reports and what information it was obtaining through the Meta Pixel in order to create them.[21] The lengthy email chain between Defendant and Facebook at the time of the Markup article where Defendant is asking basic questions about how the Meta Pixel operates and what information it gathered further evidences that Defendant implemented this tool across its whole website with little to investigation as to how it operated.[22]

Nor can Defendant hide behind the fact that its digital marketing agency Fathom supposedly signed off on the use of the Meta Pixel. (*See* MSJ at 16.) As the "account partner" at Fathom for Houston Methodist testified, Fathom did not even have any conversations with any individuals at Houston Methodist regarding Facebook's purported "filtering" mechanism until after The Markup article came out.[23] More importantly, he repeatedly testified that Fathom was only a "digital marketing agency" and that it did not, and could not, provide any guidance as to whether any marketing efforts were HIPAA compliant. [24]

**E. Defendant Implemented The Meta Pixel For A Commercial Advantage.**

Defendant's purpose for implementing the Meta Pixel was ultimately to increase patient volume. That is, the data provided by the Meta Pixel was used to "optimize [advertising]

---

[20] Effenson Dep., Ex. C, at 43:18–44:8, 44:22–46:10; Duncan Dep., Ex. G, at 27:5–19.
[21] Effenson Dep., Ex. C, at 46:11–20.
[22] June 8, 2022 email to Jacqueline Effenson, HM00013739–13743, attached hereto as Exhibit N, at HM013741 ("[redacted]
[23] Mathis Dep., Ex. A, at 110:13–111:8.
[24] *Id.* at 49:6–51:9, 64:3–19.

campaigns" and determine if they were "accomplishing the goal that [Houston Methodist was] hoping it to do in terms of driving clicks[.]"[25] As the digital marketing director for Houston Methodist testified, the purpose of the Meta Pixel "was an aggregate data piece of information that we could use . . . to help us - - help individuals find their health care."[26] And even more directly evidencing the commercial benefit that drove Defendant to place the Meta Pixel on its website is its own marketing partner explaining the reasoning: [redacted]s."[27]

**F. Plaintiffs' Interactions With Defendant's Website.**

Plaintiffs were both at different times during the relevant time period patients of Houston Methodist.[28] Plaintiffs both regularly used Defendant's MyChart portal to schedule appointments and communicate with their doctors, and Mr. Sweat also used the MyChart portal to check his medical records.[29] Importantly, both Plaintiffs looked for physicians on Defendant's website. Specifically, Mrs. Sweat used the find a doctor feature sometime at the end of 2021 to look for a doctor, [redacted].[30] Similarly, Mr. Sweat looked for a [redacted] and also [redacted] on Defendant's website.[31] Plaintiffs both used their laptop computers to interact with Defendant's website.[32] Plaintiffs also both maintained Facebook

---

[25] Duncan Dep., Ex. G, at 21:14–22; *see also* Mathis Dep., Ex. A, at 32:19–33:9.
[26] Effenson Dep., Ex. C, at 86:24–87:6.
[27] June 27, 2022 email to Molly Ruff, HM00007213–7214, attached hereto as Exhibit O, at HM00007213.
[28] Transcript excerpts of April 25, 2025 Deposition of Edward Sweat, attached hereto as Exhibit P, at 13:15–14:10; Transcript excerpts of April 25, 2025 Deposition of Marie Garza Sweat, attached hereto as Exhibit Q, at 14:11–16:11.
[29] E. Sweat Dep., Ex. P, at 30:10–20, 37:17–19; M. Sweat Dep., Ex. Q., at 17:5–7, 18:12–16.
[30] M. Sweat Dep., Ex. Q, at 23:2–20, 24:20–24, 26:10–13, 27:23–28:2.
[31] E. Sweat Dep., Ex. P, at 30:10–20, 31:10–32:12.
[32] E. Sweat Dep., Ex. P, at 47:9–20; M. Sweat Dep., Ex. Q, at 51:25–52:12.

accounts that they regularly accessed on their mobile and computer devices.[33]

## IV. LEGAL STANDARD

Summary judgment is only appropriate when the pleadings, affidavits, and other submitted evidence shows that there is "no genuine issue of material fact . . . and the moving party is entirely to judgment as a matter of law." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007). In ruling on a motion for summary judgment "all evidence submitted must be viewed in the light most favorable to the nonmovant." *Id.* If upon reviewing the record as a whole a rational trier of fact could find for the nonmoving party summary judgment should be denied. *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 107 (5th Cir. 1993).

## V. ARGUMENT

### A. There Is A Genuine Issue Of Material Fact Whether Defendant Had Knowledge That The Meta Pixel Was Sharing Individuals' IIHI With Facebook.

Defendant's initial argument as to why summary judgment should be granted is essentially that it did not "knowingly" disclose IIHI as required to state a violation of HIPAA and trigger the crime-tort exception under the ECPA. (MSJ at 12–16.) In so arguing, Defendant states that all of its team members responsible for overseeing the implementation of the Meta Pixel "believe[d]" that the Meta Pixel to be a "HIPAA-safe tool." (MSJ at 13.) To support this conclusion Defendant first leans on the fact that its digital marketing agencies recommended the installation of the Meta Pixel. (*Id.*) However, as noted above in Section III.D, Fathom, Defendant's digital marketing agency, explicitly disclaimed that it had any ability to ensure HIPAA compliance or that HIPAA compliance was part of its obligations in providing Defendant services.[34] Defendant then leans on

[33] E. Sweat Dep., Ex. P, at 55:13–56:10; M. Sweat Dep., Ex. Q, at 64:19–66:24.
[34] Duncan Dep., Ex. G., at 49:6–51:9, 64:3–19.

the fact that *it* only ever received "aggregated, campaign-level data showing how particular ad campaigns performed." (MSJ at 13.) Here Defendant not only fails to prove that it did not have knowledge that the Meta Pixel was sending IIHI, but actually supports a finding that it did have such knowledge. Specifically, as noted above in Section III.C, the fact that *Defendant* received aggregate data provides no evidence about what data Defendant disclosed to *Facebook* by implementing the Meta Pixel. As noted in deposition testimony, and as evidenced by the nature of how the Meta Pixel operated, the aggregated data that Defendant received was created as a result of individual unique interactions with Defendant's website that were tracked and sent to Facebook.[35] The fact that Defendant turned a blind eye and never looked into how the aggregated data was created and what Facebook received in order to create it[36] does not mean that it did not possess knowledge of that information when it received such data. Indeed, simply looking at the Meta Pixel code implemented by Defendant on its website itself shows that at a minimum it knew that *individual* interactions with webpages relating to treatment of health conditions were being tracked and sent to Facebook.[37]

Evidencing that Defendant did in fact have knowledge that such information was being disclosed is its own privacy policy which states that Defendant "may associate Tracking Technology with *you* when *you* are on our Service to enable us to send *you* ads about us when *you* are on third party sites or services, and we may use third-party analytics . . . to . . . provide . . . third parties with information about the use of the Service" and points to "Facebook" as the entity that provided it such "Ad serving and retargeting Ads."[38] Moreover, Defendant's reliance on the

---

[35] Duncan Dep., Ex. G, at 11:21–12:6; Effenson Dep., Ex. C, at 46:11–47:6, 86:19–87:6; Mathis Dep., Ex. A, at 105:24–107:1.
[36] Effenson Dep., Ex. C, at 46:11–20.
[37] *See* Ex. E.
[38] Ex. L, at HM00000003.

purported "filter" that Facebook claimed to have implemented to prevent IIHI from being sent to Facebook (*see* MSJ at 15–16) also shows that Defendant knew that the Meta Pixel was sending IIHI to Facebook. The disclosure by Facebook specifically states that "the filtering mechanism is designed to prevent that data from being ingested into our ads ranking and optimization systems."[39] As such, Facebook's disclosure about how the "filter" operated actually informed Defendant that the "health-related data" listed therein was still being sent to Facebook, where it would be processed in some unknown and undisclosed fashion, and would only be kept out of its "ads ranking and optimization systems."[40] Nothing in Facebook's disclosure about the filter suggests that the Meta Pixel *itself* performed any of the filtering and that it would not send the data to Facebook.

Finally, Defendant can hardly claim that it acted in "good faith" to "comply with HIPAA" (MSJ at 17) when it failed to take basic precautions before implementing a tool whose very purpose and code was to track individual interactions with its website. Indeed, Defendant did not investigate the details of how the Meta Pixel operated until after The Markup contacted it around June 2022, *5 years* after it first implemented it on its website in 2017.[41]

In short, there is significant evidence that a jury could use to find that Defendant had knowledge that the Meta Pixel it implemented on its website was transmitting IIHI to Facebook. Just because Defendant ignored the facts within its possession does not mean that it did not have knowledge of them.

---

[39] Ex. M.

[40] *Id.*

[41] Ex. B at SWEAT000005; June 8, 2022 email exchange with Facebook, Ex. N, at HM013741 ("[redacted]

**B. Plaintiffs Have Raised a Genuine Issue of Material Fact as to Whether Houston Methodist Acted With a Criminal or Tortious Purpose.**

The record supports a triable issue of fact as to whether Defendant deployed the Meta Pixel on its website with an illicit purpose. On the face of its MSJ, Defendant concedes that its use of the Meta Pixel was for a commercial purpose, which is impermissible under HIPAA when it results in the unauthorized disclosure of IIHI. 42 U.S.C. § 1320d-6 (enhancing the penalty for the wrongful disclosure of IIHI when the offense is committed "for commercial advantage"). Accordingly, the crime-tort exception within the ECPA applies, and Defendant cannot shield itself from liability under the ECPA when its actions are expressly prohibited by HIPAA. Therefore, Defendant's MSJ must be denied.

To state a claim under the ECPA, Plaintiffs must show that Houston Methodist, despite being a "party to the communication," intercepted its communications "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). Several circuits have determined that, to plead the crime-tort exception, the allegedly unlawful act must be independent of the allegedly unlawful interception. *See, e.g., Caro v. Weintraub*, 618 F.3d 94, 100 (2d Cir. 2010); *Sussman v. American Broadcasting Cos.*, 186 F.3d 1200, 1201–03 (9th Cir. 1999). Other courts find that the crime-tort exception applies only where either the "primary motivation" or "determinative factor" in a party's interception was to commit a crime or tort. *See United States v. Dale*, 991 F.2d 819, 842 (D.C. Cir. 1993); *In re Meta Pixel Healthcare Litig.,* 647 F. Supp. 3d 778 (N.D. Cal. 2022); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 514–15 (S.D.N.Y. 2001). While the Fifth Circuit has not chosen which standard to apply, either standard supports the denial of Defendant's MSJ.

As an initial matter, Defendant argues that allowing the ECPA to serve as a basis to invoke HIPAA violations would undermine HIPAA's own enforcement scheme. (MSJ at 19.) This purely

legal argument ignores the fact that courts have routinely upheld claims for ECPA violations where, as here, the plaintiffs allege that their health care providers are disclosing sensitive health information by the use of tracking pixels. *See, e.g.*, *Kurowski v. Rush Sys. for Health*, No. 22-cv-5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec 11, 2023); *Kane v. University of Rochester*, No. 23-cv-6027, 2024 WL 1178340, at *8 (W.D.N.Y. Mar. 19, 2024); *Mekhail v. North Memorial Health Care*, No. 23-cv-00440, 2024 WL 1332260, at *5–*6 (D. Minn. Mar. 28, 2024); *In re Group Health Plan Litigation.,* 2023 WL 8850243, at *8; *B.K. v. Desert Care Network*, No. 23-cv-05021-SPG, 2024 WL 1343305 at *6 (C.D. Cal. Feb. 1, 2024); *Hartley v. University of Chicago Medical Center*, No. 22-cv-5891, 2024 WL 1886909, at *2–3 (N.D. Ill. Apr. 30, 2024); *Lugo v. Inova Health Care Services*, No. 24-cv-00700, 2025 WL 905191, at *8 (E.D. Va. Mar. 25, 2025). Therefore, Defendant's scrutiny with regard to HIPAA's application in this context should be ignored.

Under the "independent purpose" standard, the crime or tort serving as the basis to invoke the exception must be distinct from the act of the interception or recording itself. *Caro*, 618 F.3d at 100 ("[m]erely intending to record the plaintiff is not enough[]"). The *Caro* court explained that if "at the time of the recording, the offender plans to use the recording to harm the other party to the conversation, a civil cause of action exists under the [ECPA]." *Id.*; *see also Lugo*, 2025 WL 905191, at *5 ("[t]he Second and Seventh Circuits have taken a more liberal approach, finding that if the interceptor's plan for, or intended use of, the recording was criminal or tortious, the crime-tort exception applies[]"). Indeed, the Western District of Texas in applying the "independent purpose" standard supported HIPAA's application to an analogous fact patterns as a means to invoke the crime-tort exception. *See Brown v. Learfield Communications, LLC*, No. 23-cv-00374, 2024 WL 3676709, at *5 (W.D.Tx. June 27, 2024) (citing *Mekhail*, 2024 WL 1332260, at *5, and

*Kurowski*, 2023 WL 8544084, at *2). Thus, there is support within this Circuit that HIPAA violations that result from the illicit use of tracking pixels can serve as an independently purposeful crime or tort to establish ECPA liability. Here, Defendant's wrongful disclosure of IIHI was not simply incidental to the interception, but a conscious objective of the utilization of the Meta Pixel itself.

To be sure, the evidence is undisputed that Defendant embedded the Meta Pixel on the entirety of its public-facing website, including specifically on webpages that "relate[] to the past, present, or future physical or mental health condition of an individual" or "the provision of healthcare to an individual" such as when a patient schedules an appointment with, or searches for, a doctor.[42] 42 U.S.C. § 1320d(6). Defendant attempts to mask its true intention in installing the Meta Pixel on its website, and its subsequent utilization of the resulting information, with soft landing buzzwords such as "commercial purpose" (MSJ at 17), "legitimate business purpose" (*Id.* at 18), and "commercial reasons" (*Id.* at 20). However, the fact that Houston Methodist was leveraging IIHI for commercial advantages itself constitutes a violation of HIPAA beyond the mere interception or recording of data. *See* 42 U.S.C. § 1320d-6. In fact, HIPAA's wrongful disclosure of IIHI provision explicitly prohibits the disclosure of such information without authorization and further enhances penalties for offenses committed when IIHI is used "for commercial advantage." 42 U.S.C. § 1320d-6.

Importantly, the statue does not require that a "commercial advantage" be monetary or

[42] Duncan Dep., Ex. G, at 11:21–12:3 ("Yeah. And so prior to when we switched our strategy in 2022, we did have campaigns in Meta that we were optimizing for what we call conversions, and in that case we were looking at did -- did the campaign encourage people to come to the site and take what we call an intent action or a conversion, *which really entails clicking on a button on the site to indicate that they're going to schedule an appointment*[]") (emphasis added); Effenson Dep., Ex. C, at 28:21–24; Ex. D; Ex. E.

result in direct revenue for the health care provider. That point is clear as the statute prohibits the disclosure of IIHI without authorization with the intent to both "sell" or "use" such information "for [a] commercial advantage." 42 U.S.C. § 1320d-6. If Congress intended to merely prohibit profiting off IIHI through sale, it would not have drafted the statute to include other impermissible uses. *See Forsyth v. Barr*, 19 F.3d 1527, 1543 (5th Cir. 1994) ("[n]eedless to say, a maxim of statutory construction precludes one part being read so as to render another superfluous[]"); *Duke v. Univ. of Tex. at El Paso*, 663 F.2d 522, 526 (5th Cir. 1981) ("[i]t is well established that a statute should be construed so that each of its provisions is given its full effect; interpretations which render parts of a statute inoperative or superfluous are to be avoided").

Obtaining analytics on how patients and website visitors interacted with specific webpages and functions on its public-facing website allowed Defendant to, amongst other things, optimize advertising spend, target high-value services, improve campaign conversion rates, and ultimately obtain more patients.[43] Therefore, the fact that Defendant *concedes* that its intended use of the Meta Pixel on its website was for business and commercial purposes confirms that the wrongful

---

[43] Mathis Dep., Ex. A, 29:21–25 ("[redacted]"); *Id.* at 103:24–104:8 ("[redacted]"); Duncan Dep., Ex. G, at 13:1–9 ("I know click-through rate is just a ratio of number of clicks divided by impressions, which is a pretty standard marketing metric that is pulled just from interaction within the app, within the Meta platform. And then intent actions is based upon after a user clicks through from the ad and comes to our site, they take an action on the site and that's attributed back to coming in from that advertisement that they saw"); Effenson Dep., Ex. C, at 82:2–11 ("Q. Do you know if those ads applied to specific conditions?· Like, for example, if someone search for "cancer treatment Houston," do you know if Houston Methodist was -- was or was likely running a sponsored ad for specific conditions? A. So we were running paid search ads for specific conditions, yes."); Ex. O, at HM00007213.

disclosure of IIHI resulted from its intention to subsequently and separately use such information for illicit commercial advantages in violation of HIPAA.

Next, even under the "primary motivation" standard, the record supports a triable issue as to whether Defendant's motivating purpose was to disclose and use its patients' and website visitors' IIHI for a commercial advantage. While Defendant argues that its purposes for utilizing tracking technologies on its website were lawful, courts have held that "the mere existence of [a] lawful purpose alone does not 'sanitize a[n interception] that was also made for an illegitimate purpose." *Cooper v. Mount Siani Health Sys., Inc.*, 742 F. Supp. 3d 369, 378 (S.D.N.Y. 2024) (quoting *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d at 514 and *Sussman*, 186 F.3d 1200, 1202). Indeed, "many crimes and torts are committed for financial gain. Therefore, having a commercial purpose in addition to the purpose of violating HIPAA . . ., does not immunize [a defendant] from [a p]laintiff's ECPA claims." *Lugo*, 2025 WL 905191 at *8. For example, having the objective to use the Meta Pixel "for commercial reasons" and to "provide analytical reporting on its [advertising] campaigns' performance" (MSJ at 20) does not immunize Defendant when such uses involve disclosure of IIHI without authorization for a commercial advantage in violation of HIPAA.

Further, Defendant's evidence of its attempts to retroactively comply with HIPAA and its purported "stressed compliance" with the statute do not absolve it from ECPA liability. (MSJ at 21, 22.) The evidence at issue is clear. Defendant installed the Meta Pixel on its website with little to no precautions and as a result it disclosed IIHI to third-parties without authorization, and Defendant's primary motivation for implementing it was to use the gathered data for commercial advantages in violation of HIPAA. Defendant's self-serving characterization of its actions are not persuasive when its own argument and employees' testimony supports the finding that the purpose

of its actions are prohibited.

Plaintiffs identify several pieces of testimony that demonstrate that Defendant's intent in its actions is impermissible under HIPAA, and such considerations are bolstered by the fact that Defendant ignored its illicit actions until it was confronted by media inquiry, after which it promptly removed the Facebook pixel. (MSJ at 8–9.). A reasonable jury could conclude just from this sequence of events alone that Defendant's intent was not merely to track anonymized website behavior, but to capture user-driven interactions on its website for its own commercial advantage, in disregard of HIPAA. And while several employees testified on their own belief that the Meta Pixel was HIPAA compliant, such self-serving assertions must be analyzed for credibility by a trier of fact, not used for legal conclusions in an attempt to show that Defendant lacked the appropriate *mens rea* for culpability. This is especially the case given the myriad of evidence showing that Defendant had direct knowledge that the Meta Pixel was collecting IIHI.

In short, the record on summary judgment is detailed with testimony that draws disputable inferences that raise substantial doubt about Defendant's self-proclaimed "permissible" conduct. These are precisely the types of credibility and intent disputes that must preclude summary judgment. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) ("[w]e must not weigh evidence or evaluate the credibility of witnesses"). Accordingly, the question of whether Houston Methodist acted with a criminal or tortious purpose under the ECPA must be resolved by a jury.

## VI. CONCLUSION

Because there is a genuine issue of material fact as to whether Defendant "knowingly" disclosed IIHI to Facebook through the Meta Pixel, as well as whether it "intentionally" did so in violation of HIPAA, Defendant's Motion for Summary Judgment as to Plaintiffs' claims under the

ECPA should be denied.

Date: June 6, 2025

Respectfully submitted,

By: /s/ *Eugene Y. Turin*

Paul O. Wickes
State Bar No. 00788663
**WICKES LAW, PLLC**
5600 Tennyson Parkway, Ste. 205
Plano, Texas 75024
(972) 473-6900
(972) 767-3225 FAX
pwickes@wickeslaw.com

Eugene Y. Turin (*S.D. Tex.* # 3874901)
Illinois Bar No. 6317282
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
eturin@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiffs and the putative class*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I filed the foregoing *Plaintiffs' Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment* using the Court's CM/ECF Filing System. A copy of said document will be electronically transmitted to all counsel of record.

/s/ *Eugene Y. Turin*